Michael A. MAYOLA,
Petitioner-Appellant,

v.

STATE OF ALABAMA,
Respondent-Appellee.

No. 79–2020.

United States Court of Appeals,
Fifth Circuit.

Aug. 11, 1980.

Rehearing and Rehearing En Banc
Denied Oct. 1, 1980.

Wilmer, Cutler & Pickering, Michael Burack, Washington, D. C., John L. Carroll, Dennis N. Balske, Montgomery, Ala., for petitioner-appellant.

Jean W. Brown, Asst. Atty. Gen., Montgomery, Ala., for respondent-appellee.

Before JONES, GEE and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

Michael Anthony Mayola was convicted and sentenced to life imprisonment on November 15, 1962 for the first degree murder of an 11 year old Alabama boy. Though he took no direct appeal from that conviction, Mayola has subsequently attempted several collateral attacks in both state and federal courts. This appeal arises from the district court's denial of his petition for habeas corpus, 28 U.S.C. § 2254, filed May 3, 1978, which followed an unsuccessful bid for writ of error coram nobis in the Alabama state courts based on essentially the same grounds, *Mayola v. State,* 344 So.2d 818 (Ala.Cr.App.), *cert. denied,* 344 So.2d 822 (Ala.1977). Though he presented several purported constitutional errors to the district court, Mayola has chosen on this appeal to press only his claim that, due to the intensive pretrial publicity and resultant community prejudice that pervaded Oneonta, Alabama and surrounding Blount County—the site of the murder and the trial, and the area from which the jury venire was drawn—he was denied his right, guaranteed by the Sixth and Fourteenth Amendments, to trial by a fair and impartial jury. Mayola also contests the district court's holding, an alternative to its rejection of the substance of his claims, that,

insofar as his petition is grounded upon a claim of pretrial publicity and jury prejudice known to Mayola and his attorneys since the trial in 1962, it is barred under the doctrine of laches as embodied in rule 9(a) of the Rules Governing § 2254 Cases, 28 U.S.C. We affirm the district court's denial of the writ.

## I. *Background*

On August 2, 1962, Larry Thomas was kidnapped after watching a little league baseball practice in Midfield, Alabama, near Oneonta. Soon thereafter, on August 7, 1962—shortly after the boy's body had been discovered in a shallow grave behind Mayola's cabin outside Oneonta—Mayola, who had been operating a barbershop in the small Alabama town, reported to the F.B.I. office in Baltimore, Maryland and apparently told officers there that he had killed a boy in Alabama. He was then arrested and, after waiving extradition proceedings, was returned to Oneonta to stand trial.

As might be expected of a crime of this nature, Larry Thomas' kidnap-murder spawned a great deal of press attention. The particular publicity of which Mayola complains is largely that attributable to the coverage given the case, and Mayola's role in it, by two Birmingham newspapers, the *Birmingham News* and the *Birmingham Post-Herald*—both alleged to have been circulated in adjacent Blount County;[1] no evidence of the content or scope of radio or television coverage was ever adduced. From the outset these two papers gave prominent and extensive written and photographic coverage to the crime and its subsequent litany of investigation and prosecution. The *News* somehow secured the deputization of one of its reporters by the Blount County Sheriff's Department, apparently in exchange for the use of the

---

1. Articles from these as well as from other newspapers, including the Oneonta *Southern Democrat* and local papers from surrounding counties, were introduced as exhibits below. The coverage accorded the murder and proceedings by papers other than the *News* and *Post-Herald* was, however, significantly less extensive and, particularly in the Oneonta paper,

was less sensational and prejudicial and more in the nature of "straight news" than the coverage carried in the Birmingham papers. Moreover, appellant has never argued that any of the newspapers published outside Blount County, aside from the *Post-Herald* and *News*, enjoyed any appreciable circulation within the county.

reporter's air-conditioned automobile, to enable him to accompany officers as they escorted Mayola back to Oneonta from Baltimore. On this junket, the reporter frequently questioned Mayola about the crime, and telephoned stories detailing the highly inculpatory fruits of these sessions, including quotations from the accused, back to the *News* as the trip progressed. In addition both newspapers published graphic accounts of Mayola's confessions given in Baltimore and upon his return to Alabama while being held overnight in a jail near Blount County where he apparently had been taken to avoid a crowd gathered for his arrival in Oneonta. The *News'* front-page report of the latter confession included photographs depicting Mayola smiling blithely while purportedly in the act of confessing. Similar coverage attended police disclosures of each discovery of additional evidence against Mayola, whether admissible at trial or not.

The attention generated by this tragic crime was undoubtedly heightened by the theme of sexual deviance associated with it which pervaded the newspaper coverage. The publicity assault commenced immediately after the kidnapping with somewhat sensationalistic front-page speculation by both papers that the boy had fallen prey to a "lunatic" or "sex pervert." Both papers subsequently published several editorials, and reported the views of prominent politicians, calling for stricter laws and more severe penalties for child molesters and other "sex perverts." Fuel was added to this inflammatory theme by the disclosure, reportedly by the F.B.I., of Mayola's previous conviction in 1955 for sodomy and his apparent involvement in another minor adventure with a child in California, and by

the disclosure that Mayola had confessed to sodomy in the instant case. Following these disclosures and the release of his confessions, Mayola was commonly referred to in news articles as a "convicted sex pervert," "confessed boy-slayer," and by other similar epithets.

News reports of developments in the police investigation and pending judicial proceedings, as well as "feature" articles obviously aimed at exploiting community sentiment, appeared almost daily from the time of the kidnapping through Mayola's return to Oneonta in the middle of August and continued to appear regularly, though less frequently, until the end of the month. Thereafter, until the eve of trial two months later, the case was given only light and sporadic attention, generally in stories dispassionately chronicling the progress in pretrial proceedings.

On Sunday, November 11, 1962, however, the morning before the jury was to be empanelled, the *News* published as its lead, front-page article an interview conducted only the day before with Mayola in his jail cell by the same *News* reporter who had tagged along on Mayola's extradition. The article reported that Mayola intended to repudiate the pleas of not guilty and not guilty by reason of insanity entered by his attorneys, and included Mayola's personal view that he was "not crazy" and would "deserve anything [he got]" for his crime. The *Post-Herald* also carried a version of the interview the following morning.

The precise response of the trial court and of Mayola's four court-appointed attorneys to this barrage of publicity, and in particular to the eve-of-trial salvo, cannot now be determined with any certainty,[2]

---

**2.** It appears that no motion for mistrial or to quash the venire was lodged on the basis of the pretrial publicity. Moreover, testimony of trial participants given in the state coram nobis hearings, adopted into the record below, reveals a discrepancy as to whether a change of venue was sought. *Compare* R. vol. 3, at 521 (Mayola's trial counsel recalls moving for venue change) *with* R. vol. 2, at 267–68 (trial judge states that venue change, though discussed, was never formally requested). These omis-

sions and discrepancies are inconsequential, however, since Mayola adequately presented the question of publicity to the district court and effectively preserved any error deriving therefrom, *see Wainwright v. Sykes*, 433 U.S. 72, 86–87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977), by moving for a continuance to allow the effects of the publicity to dissipate. *See Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966) (noting continuance as viable alternative to change of

since no transcript of the trial was produced because Mayola took no direct appeal and because the court reporter's notes were lost or destroyed sometime in the many years since the trial. It is undisputed, however, that the issue of pretrial publicity was raised to the court in the form of a motion for continuance, which was denied. Further, members of the venire were individually interrogated on *voir dire* by the court and by Mayola's attorneys, and each juror empanelled was qualified by the court on the matter of publicity and prejudice. In the ensuing trial, this jury found Mayola guilty of first degree murder and rejected his insanity plea, but resisted the expectations of the public and the exhortations of the State to prescribe the death penalty, instead meting out a sentence of life imprisonment from which Mayola declined to appeal.

Mayola did not again raise the question of jury prejudice until his fleeting reference to it 11 years later in his first unsuccessful state coram nobis petition, filed April 3, 1973. *See Mayola v. State*, 57 Ala.Cr.App. 137, 326 So.2d 665 (1976) (indicating that this and other claims had not been developed through hearing testimony). He did not seek federal habeas corpus relief on this ground until 1976 in a petition dismissed for failure to exhaust state remedies, *Mayola v. Alabama*, CA–75–A–2263–S (N.D.Ala. Apr. 2, 1976). He did not file the petition under review here—for the first time squarely presenting the jury prejudice issue for federal review—until 1978, 16 years after his conviction. Consequently, in addition to rejecting the substance of Mayola's arguments regarding pervasive pretrial publicity and jury prejudice, the district court further ruled that Mayola's petition was subject to dismissal under rule 9(a) of the Rules Governing § 2254 Cases [3] due to his unreasonable and prejudicial delay in filing that petition.

## II. *Prejudicial Pretrial Publicity*

One seeking to have his conviction nullified on the ground that he was denied a fair trial to an impartial jury due to adverse pretrial publicity ordinarily must demonstrate an actual, identifiable prejudice attributable to that publicity on the part of members of his jury. *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed. 751 (1961); *United States v. Capo*, 595 F.2d 1086, 1090 (5th Cir. 1979) *cert. denied*, 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed. 641 (1980); *Hale v. United States*, 435 F.2d 737, 746–47 (5th Cir. 1970) *cert. denied*, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971). Barring the introduction of affidavits or testimony of jurors admitting bias, proof of such prejudice without recourse to a transcript or other detailed account of the *voir dire* of the jury venire would be virtually impossible. *United States v. Haldeman*, 559 F.2d 31, 60 (D.C.Cir. 1976) *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Consequently, because of the absence of such a detailed account in this case, Mayola has never attempted to pursue this conventional approach of showing actual prejudice.

Rather, he seeks to invoke the rule announced in *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). In *Rideau* the Supreme Court, "without pausing to examine a particularized transcript of the *voir dire* examination of members of the jury," *id.* at 727, 83 S.Ct. 1417, 1419–20, overturned the conviction of a ha-

venue in the face of prejudicial publicity); *United States v. Nix*, 465 F.2d 90, 95 (5th Cir.), *cert. denied*, 409 U.S. 1013, 93 S.Ct. 455, 34 L.Ed.2d 307 (1972); 3 C. Wright, Federal Practice & Procedure § 832 at 334 (1969) (continuance may be necessary, since defendant not required to waive constitutional privilege to be tried in district of crime—assuming this guarantee applies to state proceedings, *see Zicarelli v. Gray*, 543 F.2d 466, 478–79 (3d Cir. 1976)).

**3.** Rule 9(a) of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C., provides:

(a) Delayed petitions. A petition may be dismissed if it appears that the state . . . has been prejudiced in its ability to respond to the petition by delay in its filing unless the petitioner shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred.

beas petitioner whose uncounselled confession had been filmed, recorded, and then telecast three times by the local television station to large audiences in the Louisiana parish from which the jury was drawn and in which he was tried less than two months later. The principle distilled from this holding by courts subsequently discussing the case is that where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, "[jury] prejudice is presumed and there is no further duty to establish bias." *United States v. Capo*, 595 F.2d at 1090. *E. g., Murphy v. Florida*, 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035–2036, 44 L.Ed.2d 589 (1975); *United States v. Haldeman*, 559 F.2d at 60–61; *McWilliams v. United States*, 394 F.2d 41, 44 (8th Cir. 1968), *cert. denied*, 393 U.S. 1044, 89 S.Ct. 643, 21 L.Ed.2d 593 (1969); *Pamplin v. Mason*, 364 F.2d 1, 4–5 (5th Cir. 1966). *See also, e. g., Jenkins v. Bordenkircher*, 611 F.2d 162, 165 (6th Cir. 1979) (reciting equivalent standard without referring to *Rideau* itself). These courts have held that where the *Rideau* principle applies, the petitioner clearly need not show that the pervasive community prejudice actually entered the jury box, *Pamplin v. Mason*, 364 F.2d at 5, and some circuits have indicated that the petitioner need not even demonstrate that the members of the jury panel or venire were, themselves, actually exposed to the publicity, *e. g. McWilliams v. United States*, 394 F.2d at 44.

■ Given that virtually every case of any consequence will be the subject of some press attention, however, the *Rideau* princi-ple of presumptive prejudice is only "rarely" applicable, *Nebraska Press Association v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800 (1976), and is confined to those instances where the petitioner can demonstrate an "extreme situation" of inflammatory pretrial publicity that literally saturated the community in which his trial was held. *Hale v. United States*, 435 F.2d at 747. That it is a rigorous path upon which Mayola has embarked is best illustrated by the fact that only in *Rideau*, itself, has the Supreme Court reversed a state court conviction on this basis of presumed prejudice deriving solely from pretrial publicity. *United States v. Haldeman*, 559 F.2d at 60, 61 n.32.[4] Indeed, though many courts have recited its principle in dictum and by way of distinction from the cases before them, we have been pointed to only one instance since *Rideau* in which even a circuit court has actually implemented *Rideau* to grant habeas corpus to a state prisoner, *Pamplin v. Mason*, 364 F.2d at 6–7.

Unlike the situation in most cases where presumptive prejudice has been argued, however, Mayola has adduced evidence of newspaper coverage by the *Birmingham News* and *Post-Herald* that at least approximates in the level of its prejudicial nature the dramatic spectacle of Rideau's televised confession. In fact, both the *News* and *Post-Herald* reported detailed accounts of confessions given by Mayola, as well as of other inculpatory statements attributed to him. While these newspaper accounts probably did not have the impact of a televised confession, their effect was compounded by the publication of additional, highly prejudicial matter, such as the *News'* erroneous

---

4. As the court in *Haldeman* observed, though the Supreme Court has employed the vehicle or rhetoric of presumptive prejudice to overturn other convictions, each of these cases has either "turned on factors other than [or in addition to] pretrial publicity or [has actually] involved the Court in an examination to determine whether the trial was *in fact* unfair." 559 F.2d at 61 n.32 (emphasis added). *E. g., Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (involved massive publicity *during* trial, as well as before, and a "carnival atmosphere" that permeated the proceedings);

*Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (inherently prejudicial situation presumed from constant operation of cameras and televising of proceedings during trial, in addition to pretrial publicity); *Turner v. Louisiana*, 379 U.S. 466, 84 S.Ct. 972, 11 L.Ed.2d 969 (1965) (prejudice presumed from continual personal contact with jurors by crucial witnesses, deputy sheriffs, during trial and deliberations); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (court reviewed *voir dire* transcript and found actual jury prejudice).

reports that a state toxicologist's examination had shown the boy to have been sexually assaulted and that his body had been mutilated, and recurring references by both papers to Mayola's prior conviction for sodomy and to other unfavorable or inculpatory facts similarly inadmissible at trial. The effect of such reports frequently was enhanced and their authority and credibility bolstered by their attribution of numerous details to official sources, such as the sheriff's department, that apparently had freely supplied these condemnatory items to the press. The entirety of the coverage was, of course, permeated with exploitative allusions to petitioner's alleged sexual "perversion."

■ Nevertheless, although this publicity certainly was prejudicial—and may very well have been sufficiently so as to have satisfied *Rideau* and its gloss on this point—Mayola has failed to prove that the prejudicial newspaper coverage so saturated and tainted the Blount County populace that any subsequent proceeding in that county would have been unavoidably poisoned by it. Unlike the petitioner in *Rideau*, who adduced evidence that his televised confession had been seen by tens of thousands of citizens in the Louisiana parish of 150,000 from which the jury had been drawn, as well as by three of the jurors who actually heard his case, Mayola produced no Blount County newspaper circulation figures [5] or any other evidence of the scope of

that county's exposure to the offensive *News* and *Post-Herald* articles.[6] *United States v. Ricardo*, 619 F.2d 1124, 1131, 1132 (5th Cir. 1980) (failure to adduce newspaper circulation statistics instrumental in court's rejection of appellant's pretrial publicity claims). In the absence of such proof, petitioner could hardly have demonstrated the pervasiveness or saturation level of prejudicial publicity necessary to invoke the *Rideau* presumption.

■ While it may be conceded that this rather spectacular case and its participants achieved a significant degree of notoriety in this small Alabama community, such notoriety alone does not excuse the need for circulation figures or other evidence of the degree of community exposure to the prejudicial content of the offensive news coverage. As the Supreme Court and lower courts have continually reiterated, the constitutional standard of fairness requires only that the accused have "a panel of impartial, 'indifferent' jurors," who base their decision solely on the evidence produced in court; it does not require jurors to be wholly ignorant of the case. *E. g., Murphy v. Florida*, 421 U.S. at 799–800, 95 S.Ct. at 2035–2036, *quoting Irvin v. Dowd*, 366 U.S. at 722–23, 81 S.Ct. at 1642–1643; *United States v. Williams*, 568 F.2d 464, 467–68 (5th Cir. 1978). Thus, broad and intensive public awareness was held not to have triggered *Rideau* or to have deprived defend-

---

5. Though petitioner states in his brief, p. 35 n.21, that the *News* was the most widely circulated paper in Blount County in 1962, he points to no record evidence to support this assertion or to demonstrate the actual extent of circulation. Petitioner's counsel in his second state coram nobis hearing, the transcript of which was incorporated by the district court below, attempted without success to elicit such information on direct examination of a *Birmingham News* reporter. R. vol. 2, at 242. Rebuffed there, counsel then sought to have the court take judicial notice of the broad circulation of the *News* in Blount County, to which the court responded, somewhat enigmatically, that he would "take judicial notice of all the evidence in this case." *Id.* at 242–43. Since no evidence of circulation was actually proffered, we can only conclude that the court did not accede to counsel's request.

6. Statistical data, such as circulation or audience figures, obviously would not be the sole means of proving a widespread effect of offensive publicity. For example, this court acknowledged in *Pamplin v. Mason*, 364 F.2d at 6 n.9, that, consistent with *Rideau*, a trial court might "utiliz[e] the voir dire to help gauge the intensity of community prejudice inspired by pre-trial publicity." *See also Murphy v. Florida*, 421 U.S. at 802–03, 95 S.Ct. at 2037–2038. Such a direct sampling of the members of the community would have the added salutary effect of revealing the degree of any secondary, word-of-mouth dissemination of the prejudicial details of the inflammatory news reports. Of course, any such indications that might have been gleaned from the *voir dire* in this case are lost to us along with the court reporter's notes. Mayola adduced no other evidence of this nature.

ants of fair trials growing out of two of the most notorious events of this nation's recent past, the battlefield execution of Vietnamese civilians by Lt. William Calley, Jr., and other soldiers, *Calley v. Callaway,* 519 F.2d 184, 203–13 (5th Cir. 1975) *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976), and the high level conspiracy to cover up the Watergate break-in, *United States v. Haldeman,* 559 F.2d at 60–69.

■ To satisfy his burden even in such sensational cases, the petitioner must, therefore, demonstrate that the populace from which his jury was drawn was widely infected by a *prejudice* apart from mere familiarity with the case. Where, as here, the petitioner relies solely upon the inflammatory details and tenor of particular newspaper articles as the seeds of that prejudice, he must evince some indication of the ambit of the dissemination of this poisonous palaver. Without such, no measure of the taint alleged to have derived from it can be deduced, and certainly the pervasive prejudice required to trigger *Rideau* will not have been proved.

Accordingly, due to petitioner's failure to adduce any evidence of the scope of the exposure of the Blount County population to the offensive news coverage on which he relies, we hold that he has not shown the pervasive community prejudice required to trigger the *Rideau* presumption. Such pervasive prejudice may not be presumed simply from the content of the articles alone. *See Bassett v. Dutton,* 402 F.2d 263 (5th Cir. 1968) (declining to overturn conviction despite alleged "massive pervasive, and prejudicial publicity" solely on the basis of the articles in question, without proof of the degree of their influence, if any). Thus, since petitioner attempted to prove no actual prejudice, the district court correctly denied his petition for habeas corpus.

### III. *Rule 9(a)*

■ Even if Mayola had mustered proof to create the appearance of community prejudice sufficient to raise the *Rideau* presumption, his petition would still have been properly dismissed by the district

court. A petition for habeas corpus may be dismissed under the equitable doctrine of laches or its embodiment in rule 9(a) of the Rules Governing § 2254 Cases if (1) the petitioner has delayed unreasonably in the filing of his petition, and (2) the state can demonstrate that it has suffered actual prejudice from the delay in its ability to respond to the grounds upon which habeas is sought. *See Baxter v. Estelle,* 614 F.2d 1030, 1032–33 & n.2 (5th Cir. 1980) (quoting Advisory Committee Note equating rule 9(a) standards with traditional laches standard).

In this case Mayola knew or should have known since the time of his trial in 1962 of the facts underlying his claim and of his constitutional right to an impartial jury. It is undisputed that, his attorneys moved for a continuance at trial in a specific attempt to avert the effects of the pretrial publicity, and—while we cannot now discern the precise content of their questioning—these attorneys undeniably gave great attention to the issue of prejudice due to publicity in their interrogation of the veniremen on *voir dire.* Nonetheless, Mayola waited 11 years before again raising the issue to any court in any fashion, and did not effectively present the question for federal review for 16 years. Consequently, we have no difficulty in agreeing with the district court that this protracted delay was unreasonable. *Baxter v. Estelle,* 614 F.2d at 1034 (similar delay, also with knowledge of rights since 1962 proceeding, held unreasonable).

The question whether this unreasonable delay was also prejudicial is more complex. The district court held that serious prejudice to the State of Alabama inhered in the virtual impossibility of accurately reconstructing the events of petitioner's trial and jury selection due primarily to the loss of the court reporter's notes of the proceedings, as well as to the death, unavailability, or impairment of the recollections of numerous witnesses—all of which transpired sometime during, and is therefore attribut-

able to, petitioner's unreasonable delay.[7] R. vol. 4, at 727. *See Baxter v. Estelle*, 614 F.2d at 1035; (state's ability to rebut claim of ineffective assistance of counsel on guilty plea entered fifteen years earlier, impaired by intervening loss of transcript and unavailability of witnesses); *Honeycutt v. Ward*, 612 F.2d 36, 42 (2d Cir. 1979) (loss of transcript prejudicial to state).

Prejudice to the state may not merely be presumed, however, from the absence of a transcript or of witnesses necessary to re-count the details of a proceeding. Rather, the state must actually be disadvantaged by the absence of such resources in responding to the particular allegations or theories as-serted by petitioner as grounds for habeas corpus. *See Lewellyn v. Wainwright*, 593 F.2d 15, 17 (5th Cir. 1979) (loss of sentenc-ing hearing transcript due to hurricane dur-ing six year delay in filing of habeas corpus petition held not prejudicial to state so as to allow dismissal of petition where recourse to that transcript was not essential to issues before the court). Mayola contends, accord-ingly, that no prejudice to the State exists in this case because, as illustrated by *Ri-deau* itself, 373 U.S. at 727, 83 S.Ct. at 1419, the theory of presumptive jury prejudice upon which he relies may be implemented without any particularized scrutiny of the *voir dire* examination of the jury venire. All that is required is evidence of sufficient-ly pervasive and prejudicial pretrial publici-ty.

Yet, even though Mayola is correct inso-far as he asserts that a petitioner may muster sufficient indicia solely in the form of extensive, inflammatory publicity to raise an appearance of pervasive communi-ty prejudice and, therefore, of an entitle-ment to the *Rideau* presumption, this does not mean that the fruits of *voir dire* are entirely superfluous. The Supreme Court

in *Rideau* did not go so far as to indicate that *voir dire* had no role in the paradigm of presumptive prejudice that it announced there. In fact, as indicated earlier, *supra* note 6, this court has previously observed that "[u]nder the *Rideau* rule the trial court is not precluded from utilizing the voir dire to help gauge the intensity of community prejudice inspired by pre-trial publicity." *Pamplin v. Mason*, 364 F.2d at 6 n.9. Thus, even where petitioner adduces evidence of widely disseminated, adverse publicity, the actual interrogation of members of the community on *voir dire* may belie the ap-pearance of any pervasive community prej-udice—for example by demonstrating a general lack of credence in or familiarity with the prejudicial aspects of the publicity. *See Murphy v. Florida*, 421 U.S. at 800-03, 95 S.Ct. at 2036-2038. *Cf. United States v. Capo*, 595 F.2d at 1089 n.2, 1091 (declining to find pervasive community prejudice, de-spite 21 stories in the city's largest newspa-per within the three months before trial and over 120 different prejudicial television news reports, where *voir dire* nonetheless revealed only vague familiarity of venire-men with prejudicial details). Thus, the lack of a detailed account of the *voir dire* here deprived the State of this opportunity to demonstrate that the pervasive commu-nity prejudice necessary to trigger *Rideau* did not actually exist despite the inference that might be drawn from the newspaper coverage alone.

■ In addition, even if pervasive com-munity prejudice were undisputedly proved and the *Rideau* presumption invoked—thereby relieving petitioner of the burden of showing actual jury prejudice—the State should have had the opportunity to redeem the conviction from this presumption of in-validity by shouldering the burden of prov-ing that the twelve jurors finally impan-

---

7. There is no indication that the loss or destruc-tion of the court reporter's notes was a deliber-ate act of discrimination against Mayola or that their absence was otherwise attributable to cul-pable conduct by the State. "It has never been held unconstitutional for a state to authorize the destruction of criminal transcript or court reporter's notes after a reasonable period of

time has elapsed." *McGarrity v. Beto*, 335 F.Supp. 1186, 1189 (S.D.Tex.), *aff'd per curiam*, 452 F.2d 1206 (5th Cir. 1971), *cert. denied*, 406 U.S. 909, 92 S.Ct. 1619, 31 L.Ed.2d 820 (1972). *Accord Worts v. Dutton*, 395 F.2d 341, 343 (5th Cir. 1968). *See also, Norvell v. Illinois*, 373 U.S. 420, 83 S.Ct. 1366, 10 L.Ed.2d 456 (1963).

elled actually were impartial. While it appears that no court has yet broached this question whether the presumption of jury prejudice under *Rideau* is rebuttable, as the Supreme Court observed in *Nebraska Press Association v. Stuart,* "pretrial publicity— *even pervasive, adverse publicity* [the cornerstone of the *Rideau* presumption]—does not inevitably lead to an unfair trial." 427 U.S. at 554, 96 S.Ct. at 2800 (emphasis added). Where, despite the existence of such hostile publicity, the state demonstrates that an impartial jury was actually impanelled, the fair trial guarantees of the Sixth and Fourteenth Amendments that the *Rideau* rule was articulated to protect will have been satisfied. Consequently, we believe the state should be accorded this opportunity to rebut the presumption of jury prejudice.

▄ Although the state's burden would be very difficult to carry, it would not be insurmountable. Of course, it could not be satisfied merely by the jurors' assurances on *voir dire* of their own impartiality. *See Murphy v. Florida,* 421 U.S. at 800, 95 S.Ct. at 2036; *Irvin v. Dowd,* 366 U.S. at 727–28, 81 S.Ct. at 1645–1646. On the other hand, a showing that none of the twelve jurors impanelled had ever been exposed, first or second hand, to the inflammatory publicity, would probably suffice to negate the presumption of prejudice flowing from that publicity. Thus, for example, in the case at bar the trial could easily have been insulated from the effects of the single most prejudicial article—the eve-of-trial interview in which Mayola repudiated his insanity defense—simply by the exclusion of all veniremen who had seen the article. Yet even if this scenario constitutes an accurate portrayal of the jury selection in this case, the State was deprived below of the opportunity to make such an exonerative showing by the lack of a transcript or any other

detailed account of the *voir dire* due to petitioner's unreasonable delay in asserting his jury prejudice claim.

Consequently, we conclude that Mayola's unreasonable delay in seeking habeas corpus on grounds of jury prejudice due to pretrial publicity did prejudice the State's ability to respond to his requests. Therefore, the district court did not err in ruling that Mayola's petition was subject to dismissal pursuant to rule 9(a).

## IV. *Officials' Role in Publicity*

▄ Mayola argues that the conscious involvement of government officials in generating the prejudicial pretrial publicity should constitute an independent basis for overturning his conviction.[8] Without question, some of the most damaging information published by the *News* and *Post-Herald,* much of which (such as the content of Mayola's confessions) could and should have remained confidential, emanated from official sources. The conduct of the Blount County Sheriff's Department in allowing a *News* reporter to accompany officers on the extradition of Mayola from Maryland and to question him extensively on the return trip was particularly outrageous.

Such antics are certainly worthy of censure and disciplinary action, and we would echo Mr. Justice Frankfurter's castigation of the State's making itself "a conscious participant in trial by newspaper, instead of by those methods which centuries of experience have shown to be indispensable to the fair administration of justice." *Stroble v. California,* 343 U.S. 181, 201, 72 S.Ct. 599, 609, 96 L.Ed.2d 872 (1952) (Frankfurter, J., dissenting). Nonetheless, absent some proof that such conduct or publicity actually prejudiced petitioner's right to a fair trial, we can perceive no deprivation of due process such as would justify the overturning of his conviction.[9] Nor, even assuming

---

8. Mayola also suggests that this official involvement should at least reduce the showing of prejudice necessary to overturn his conviction. Even if this were true, since Mayola has made *no* showing of actual prejudice, the principle would not aid his petition.

9. Petitioner's attempt to extrapolate such a rule from the holdings in cases such as *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (reversal for prosecutor's failure to disclose impeachment material) and *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (prosecutor's knowing fail-

that we have the power to do so, are we prepared today to announce as a prophylactic in aid of due process and against such future misconduct by police, a rule that would require the abrogation of a conviction arrived at by a process not shown actually to have been unfair in any respect. The cost to society is simply too great.

Accordingly, for the reasons set forth above, the judgment of the district court is AFFIRMED.

ure to correct perjury), though creative, is unproductive. These cases involved the "deliberate deception of a court and jurors," a manipulation of the factfinding process by the presentation of misleading evidence or suppression of exculpatory evidence—a practice held to be "incompatible with 'rudimentary demands of justice.'" *Giglio v. United States,* 405 U.S. at 153, 92 S.Ct. at 766. Given the many procedural safeguards, such as *voir dire* and jury sequestration, for insulating a trial from potentially prejudicial effects of publicity, a state's conscious participation in such publicity, though deplorable, simply does not carry the potential for injustice as does the deliberate skewing of the trial process itself.