This matter comes for consideration upon the record, the parties' briefs, and their oral arguments before this court. Appellants Jeffrey Riddle, Lavance Turnage, and Bernard Altschuler (hereinafter referred to when appropriate as "Appellants") timely appeal the decision of the Mahoning County Court of Common Pleas sentencing each to life in prison with the eligibility of parole in twenty years for engaging in a pattern of corrupt activity and other various crimes. For the following reasons, we affirm the judgment of the trial court.
Although Appellants were prosecuted for their involvement in a crime organization which involved participating in numerous organized criminal activities, the instant case revolves around three different events: 1) the shooting of Attorney Gary Van Brocklin (hereinafter "Van Brocklin"), 2) the attempted murder of Prosecutor Paul Gains (hereinafter "Gains"), and 3) the murder of Ernie Biondillo (hereinafter "Biondillo").
Lenine Strollo (hereinafter "Strollo") headed the Strollo crime family, an illegal enterprise specializing in gambling and political corruption centered in Mahoning County, Ohio. Biondillo had been the principal lieutenant of Joey Naples, Strollo's deceased former partner and head of the criminal organization. Biondillo refused to join Strollo's enterprise and instead operated a rival criminal organization. Biondillo then planned to have Strollo killed.
After Strollo found out about these plans, Bernie Altschuler (hereinafter "Altschuler") volunteered to recruit individuals to assist in the murder of Biondillo. Altschuler first recruited Jeffrey Riddle (hereinafter "Riddle") to kill Biondillo. Riddle then obtained George Wilkins' (hereinafter "Wilkins") assistance in the murder. Lavance Turnage (hereinafter "Turnage") and Warren Willis (hereinafter "Willis") blocked Biondillo's car while Biondillo was shot.
After Biondillo was shot, Turnage was charged with aggravated burglary, aggravated robbery, and felonious assault and hired Van Brocklin to represent him. Riddle and Wilkins asked Van Brocklin to get a continuance in Turnage's case. As Van Brocklin did not obtain a continuance, Turnage checked himself into a hospital. On April 1, 1996, the date Turnage's case was scheduled to begin, Van Brocklin was shot in his office by, at that time, an unknown assailant. Van Brocklin ceased representing Turnage and Attorney Mike Rich (hereinafter "Rich") took over handling the case, successfully negotiating a favorable plea agreement for Turnage.
It was later discovered Altschuler asked Strollo to help fix Turnage's case. Strollo used George Alexander (hereinafter "Alexander"), a disbarred attorney, to bribe former Mahoning County Prosecutor James Philomena (hereinafter "Philomena"). Strollo helped fix the case because he believed Turnage to be one of Altschuler's main guys, i.e. one of the men who participated in the Biondillo murder. Because Van Brocklin would not participate in the scheme, Alexander needed time to fix the case and replace Van Brocklin with Rich. Altschuler employed Mark Batcho (hereinafter "Batcho") to shoot Van Brocklin in his office, which he later did, with Riddle assisting as lookout.
Altschuler then asked Strollo to fix another case, this time for Antwan Harris (hereinafter "Harris"), a local drug dealer. However, before the case could proceed to trial, Gains defeated Philomena in the November, 1996 election for prosecutor, seemingly precluding Stollo from fixing Harris' case through Philomena. Alexander suggested Strollo kill Gains, thereby enabling Philomena to stay in office until a successor could be chosen, allowing Strollo to continue to fix cases.
Strollo decided to "remove" Gains so the Harris case could be fixed. Batcho was again recruited for the job. Harris, Riddle, and Altschuler met to discuss the terms of the case-fixing. Harris later assisted Riddle and Batcho in shooting Gains, who survived, and succeeded Philomena as prosecutor in January, 1997.
On December 4, 1998, a Mahoning County Grand Jury issued a secret indictment against Appellants and other individuals alleging multiple offenses including 1) engaging in a pattern of corrupt activity, a felony of the first degree; 2) aggravated murder, a felony-life offense; 3) conspiracy to commit aggravated murder, a felony-life offense; 4) attempted murder, a felony of the first degree; 5) conspiracy to commit murder, a felony of the first degree; 6) felonious assault, a felony of the second degree; and 7) theft by deception, a felony of the third degree. Appellants had previously been indicted and convicted in the United States District Court for the Northern District of Ohio under federal R.I.C.O. statutes for engaging in violent and corrupt activities.
The trial court deemed Appellants to be indigent and appointed each separate counsel to represent them. Before the cases proceeded to trial, many co-conspirators entered into plea agreements with the state in exchange for testimony against Appellants.
Along with several other requests, counsel for Riddle filed a motion for change of venue on February 16, 1999 based upon extensive pre-trial publicity which was denied at trial. The jury found Appellants guilty of all charges with the exception of the charge relating to the theft and deception of Harris, and were sentenced by the trial court on June 22, 1999.
Appellants raise seven assignments of error, the first of which asserts:
 "The State Court Prosecution Against Appellant Violates the Double Jeopardy Provisions of U.S. CONST. amend. V and XIV and OHIO CONST. art. I, sec. 10, the Due Process Clause of the U.S. CONST. amend. XIV and the Provisions of OHIO CONST. art. I, sec. 16; and Appellant Was Denied the Effective Assistance of Counsel, see, U.S. CONST. amend. VI and XIV and OHIO CONST. art. I, sec. 10 When Counsel Failed to File a Motion to Dismiss the State Court Prosecution on Double Jeopardy Grounds."
Appellants' first assignment of error argues two separate, yet related, propositions of law; that the state court prosecution violated double jeopardy, and further, trial counsel was ineffective for not requesting a dismissal for that violation. Although Appellants concede a failure to raise the issue of double jeopardy before the trial court waives any possible error, they assert the failure was an error so unprofessional that it deprived them of a fair trial.
As to the merits of their arguments, Appellants admit that, generally, the doctrine of dual sovereignty permits successive prosecutions by two separate sovereigns. See State v. Fletcher (1971), 26 Ohio St.2d 221, 55 O.O.2d 464, 271 N.E.2d 567; Heath v. Alabama (1985), 474 U.S. 82,106 S.Ct. 433, 88 L.Ed.2d 387. However, they cite Bartkus v. Illinois
(1959), 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684, for the proposition that this prosecution was a sham prosecution which violated their rights against double jeopardy.
In Bartkus, the United States Supreme Court held a successive state court prosecution after an acquittal on federal charges does not violate due process. However, Bartkus did find "sham prosecutions" to be a violation of the Fifth Amendment. Sham prosecutions occur when the successive state prosecution is merely a cover for the previous federal prosecution. "To fit within the exception, the defendant must show that one sovereign was so dominated, controlled, or manipulated by the actions of the other that it did not act of its own volition." United States v.Raymer (C.A.10, 1991), 941 F.2d 1031, 1037. "The burden * * * of establishing that federal officials are controlling or manipulating the state processes is substantial; the Appellant must demonstrate that the state officials had little or no independent volition in the state proceedings." United States v. Liddy (C.A.D.C. 1976), 542 F.2d 76, 79. This exception is so narrow some courts question whether it even exists. See United States v. Baptista-Rodriguez (C.A.11, 1994)17 F.3d 1354, 1362.
As Bartkus points out, even when federal officers solicit the state indictment, arrange to assure the attendance of key witnesses, unearth additional evidence to discredit the defendant and defense witnesses, and aid in preparing and guiding the state prosecution, the subsequent state prosecution is not a sham prosecution:
 "The record establishes the prosecution was undertaken by state prosecuting officials within their discretionary responsibility and on the basis of evidence that conduct contrary to the penal code of Illinois had occurred within their jurisdiction. It establishes that the federal authorities acted in cooperation with state authorities, as is the conventional practice between two sets of prosecutors throughout the country. It does not support the claim that the State of Illinois in bringing its prosecution was merely a tool of the federal authorities, who thereby avoided the prohibition of the Fifth Amendment against a retrial of a federal prosecution after an acquittal. It does not sustain a conclusion that the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution." Bartkus at 123-124, 79 S.Ct. at 678, 3 L.Ed.2d at 686-687.
Here, Appellants claim the only significant role the State of Ohio played in its prosecution was to supply two prosecutors to actually try the case. They make two arguments to support their claim; that the only investigation was done by the Federal Bureau of Investigation, led by Special Agent Kroner, and that Prosecutor Gains and his office ceded control of the investigation of his shooting to the federal authorities. However, as Bartkus and its progeny have found, cooperation and joint investigations between federal and state sovereigns does not make one sovereign the "tool" of the other. The only Ohio case which squarely addresses the Bartkus exception, State v. Smith (1991),61 Ohio Misc.2d 165, 575 N.E.2d 1231, notes cooperation between the two sovereigns is encouraged and, in fact, praised. Id. at 167,575 N.E.2d at 1232.
In the present case, the state introduced testimony from its own, independent witnesses. For example, Youngstown Police Department Officer Dan Olbrych testified he was the first officer to arrive at the scene of Van Brocklin's shooting. Youngstown Police Detective John Palma testified he and a Mahoning County Sheriff's deputy were the first officers to arrive at the Biondillo murder scene. Mahoning County Deputy Coroner, Dr. Jesse Giles, testified regarding the cause of Biondillo's death. Ohio Bureau of Criminal Identification and Investigation Agent, John Saraya, testified concerning his investigation of the attempted murder of Gains. Appellants' claim that the state carried out no independent investigation is unfounded in light of this sample of the witnesses at the trial.
Regarding Appellants' claim that Gains ceded his prosecutorial authority to the federal government, Gains's role as a victim created a conflict of interest which he and his office had to resolve. Gains did not cede his prosecutorial authority to the federal government. Rather, Gains merely surrendered the decision to appoint a special prosecutor to the federal government. Moreover, when federal prosecutors met with their counterparts to discuss possible plea agreements, it was only at Harris' request because he insisted upon negotiating plea agreements in exchange for his testimony in both state and federal proceedings.
Appellants further argue the charges brought against the defendants in this case mirror those brought against the same defendants in the federal case. This argument is inconsequential. Under the doctrine of dual sovereignty a conviction or acquittal for a federal offense does not create a double jeopardy bar to a subsequent prosecution in Ohio courts for the same criminal acts. Fletcher, supra at 227, 55 O.O.2d at 465, 467, 271 N.E.2d at 570. Appellants have therefore failed to establish the state conducted a "sham" prosecution.
We next turn to Appellants' claim that counsel was ineffective for not requesting a dismissal based on double jeopardy grounds. To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate counsel's performance was deficient and that deficient performance prejudiced the defense. Strickland v. Washington (1984), 466 U.S. 668,687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. A properly licensed attorney is presumed to execute his duties in an ethical and competent manner. State v. Smith (1985), 17 Ohio St.3d 98, 17 OBR 219,477 N.E.2d 1128. Ineffectiveness is demonstrated by showing that counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. State v. Hamblin (1988),37 Ohio St.3d 153, 524 N.E.2d 476. To establish prejudice, a defendant must show there is a reasonable possibility that, but for counsel's errors, the result of the proceeding would have been different.Strickland at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.
As discussed supra, even if counsel had filed a motion to dismiss, the trial court would have properly denied that motion. There was not a reasonable possibility that, but for counsel's failure to file the motion to dismiss, the outcome of the case would have been any different. Consequently, Appellants' first assignment of error is meritless.
In their second assignment of error, Appellants assert:
"The Trial Court erred by improperly allowing the admission of the State's audio tapes and accompanying written transcripts."
Appellants' second assigned error claims the trial court erred in three ways: 1) by admitting audiotapes and transcripts without first requiring that a proper foundation be established; 2) by admitting audiotapes and transcripts containing statements made by co-conspirators before a conspiracy had been established; and, 3) by allowing the admission of the transcripts of the tape recordings into evidence.
During Strollo's testimony, the trial court permitted the jury to listen to audiotapes containing taped conversations between Strollo and others. The first recording contained Strollo's conversation with Alexander about fixing criminal cases. The subject of the second tape was Alexander's attempts to contact Philomena. The third tape contained conversation between Strollo and Altschuler regarding whether Turnage's case would go forward or be postponed. The fourth tape involved a conversation between Strollo and Rich, also relating to the fixing of Turnage's case. Later in that tape, Altschuler and Alexander also participated in the conversation. The court also allowed the prosecution to provided the jury with unedited transcripts of the tapes so the jury could follow along.
After the tapes were played, the state requested they be admitted into evidence. Appellants objected based on the lack of authenticity and lack of relevancy. The court overruled the objection, explaining:
 "* * * obviously the motives of various people and the general nature of the alleged enterprise and the conspiracy are to some extent intertwined and interrelated, and therefore I believe there is sufficient elements."
* * *
"[T]hey are relevant to the extent that they show the nature of the activity of the people who are participating in the conversations. I have not heard them implicate in the conversations anyone else. 801(D)(2)(e) will be significant to the extent if they implicate somebody else other than the people who are speaking themselves."
After this ruling, the prosecution introduced the sixth tape. Strollo testified the sixth tape contained conversation between himself, Altschuler and Rich. However, the transcript given to the jury purported to have only two recorded speakers on that particular tape. Strollo was asked to listen to the tape again. After reviewing the tape for a second time, Strollo testified there were, in fact, only two voices on the tape. At the conclusion of direct examination, defense counsel moved for a mistrial.
Appellants first claim it was error to admit the audiotapes into evidence before the requisite foundation had been laid. As a general rule, a foundation for admissibility is laid by evidence sufficient to support a finding that the matter in question is what its proponent claims. Evid.R. 901(A). For instance, a voice may be identified by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker. Evid.R. 901(B)(5). Although Appellants argue to the contrary, pursuant to Evid.R. 901(B)(5), a witness may identify his own voice. State v. Ogle (Jan. 2, 1996), Ashland App. No. 1111, unreported; see also State v. Brown (1995), 107 Ohio App.3d 194,198, 668 N.E.2d 514, 516.
Regardless, Special Agent Kroner later testified as to the contents of the recordings and the accuracy of the transcripts, thereby establishing a proper foundation. Appellants claim the trial court erred by permitting the foundation to be established after the evidence was admitted. Foundation may be linked up by a subsequent witness pursuant to Evid.R. 104. Consequently, Appellants' argument relating to the lack of foundation fails.
Appellants next assert the tapes were improperly admitted because they contained hearsay evidence. Specifically, Appellants claim the admission of the tapes violated Evid.R. 801 and their confrontation rights. Nowhere in their argument do Appellants mention their right to confront witnesses, let alone cite authority supporting a claim that those rights were violated. Because of this failure, we are precluded from addressing this argument pursuant to App.R. 12(A) which provides:
 "The court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)."
Accordingly, we will only determine whether admission of the tapes violated Evid.R. 801.
In addition, a reviewing court will not consider any error that counsel could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court. See State v. Peagler (1996), 76 Ohio St.3d 496, 499, 668 N.E.2d 489,492. Failure to object waives an issue on appeal unless the error is determined to be plain error under Crim.R. 52(B). State v. Burrow
(2000), 140 Ohio App.3d 466, 748 N.E.2d 95. Plain error, however, is to be invoked "only to prevent a manifest miscarriage of justice." Statev. Long (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus.
Under Evid.R. 801(D)(2)(e), hearsay does not include a statement offered against a party that is made "by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." A co-conspirator's statement is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof. State v. Carter (1995), 72 Ohio St.3d 545,651 N.E.2d 965 at paragraph three of the syllabus. However, the early admission of statements that could have been deemed hearsay at the time they were elicited is harmless if independent proof of the conspiracy is admitted into evidence before the case is submitted to the jury. Statev. Jalowiec (2001), 91 Ohio St.3d 220, 227, 744 N.E.2d 163, 173.
In the present case, sufficient evidence was introduced providing independent proof of a conspiracy when Wilkins and Willis testified at length regarding their involvement with Riddle and Altschuler. Both testified they were recruited by Riddle to murder Biondillo at Altschuler's direction. Furthermore, Special Agent Kroner testified about the lengthy federal investigation of the "Strollo enterprise" and the evidence that was gathered from direct investigation, confidential informants, and surreptitious wiretaps. Consequently, admission of the tapes did not violate Evid.R. 801.
In their final argument, Appellants assert the trial court committed reversible error when it allowed the prosecution to introduce the transcripts of the audio tapes into evidence. With a proper limiting instruction, it is not an abuse of discretion for a trial court to admit transcripts of audio tapes into evidence. State v. Mason (1998),82 Ohio St.3d 144, 159, 694 N.E.2d 932, 950. Transcripts are useful and easier to understand than audio tapes. Id. "`Where there are no "material differences" between a tape admitted into evidence and a transcript given to the jury as a listening aid, there is no prejudicial error.'" Id. quoting State v. Waddy (1992), 63 Ohio St.3d 424, 445, 588 N.E.2d 819,835.
In the present case, the trial court allowed the transcripts to go to the jury and gave a detailed limiting instruction when it did so. Therefore, the trial court did not err in admitting the transcripts into evidence. Because each of their arguments fail, Appellants' second assignment of error is meritless.
In their third assignment of error, Appellants argue:
 "Appellants Were Denied the Effective Assistance of Counsel; Ineffective Assistance of Counsel Violates Not Only a Defendant's Rights under U.S. CONST. amend. VI and XIV and OHIO CONST. art. I, sec. 1 AND 10; but also the Right to a Fair and Impartial Jury Guaranteed by the U.S. CONST., amend. V, VI, and XIV and by OHIO CONST., art. I, sec. 5, 10, AND 16."
Appellants claim they were denied effective assistance of counsel based upon trial counsel's failure to move for a change of venue or seek individual voir dire and to challenge the admissibility of snitch testimony. As stated above, to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate counsel's performance was deficient and that deficient performance prejudiced the defense.Strickland at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. A properly licensed attorney is presumed to execute his duties in an ethical and competent manner. Smith, supra. Ineffectiveness is demonstrated by showing that counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. Hamblin,supra. To establish prejudice, a defendant must show there is a reasonable possibility that, but for counsel's errors, the result of the proceeding would have been different. Strickland at 694,104 S.Ct. at 2068, 80 L.Ed.2d at 698.
This assignment of error fails because counsel did in fact file a motion for a change of venue, as the record reveals the motion was filed on February 16, 1999. Further, the method of voir dire utilized by both the trial court and counsel resulted in an impartial jury, as will be discussed, infra. Finally, Appellants cannot argue the failure to challenge the admissibility of the snitch testimony was deficient performance of counsel, as "snitch" testimony is admissible evidence. See, infra. This assignment of error is meritless.
In Appellants' fourth assignment of error, they argue:
 "Appellants Were Denied Due Process When the Government Built Its Case and Secured Convictions on Wholly Unreliable Snitch Testimony."
Appellants dedicate twenty pages of their brief to this assignment of error, yet fail to cite any authority prohibiting the use of this type of evidence. Appellants themselves concede their argument is "somewhat novel", asserting the State's use of testimony "purchased" by plea agreements is prohibited because that testimony is, by its very nature, false or perjured.
While it is true the state's witnesses negotiated plea agreements in exchange for their testimony, it is common practice for the government to reduce or drop charges against persons who cooperate with law enforcement officers in the prosecution of others. Crim.R. 11 contemplates the State may negotiate a plea with a defendant. This practice, rather than deemed to be violating due process, is encouraged by the court system. A contract which encourages the introduction of relevant testimony is an aid to the final determination of the true situation. United States v.Mezzanatto (1995), 513 U.S. 196, 204-205, 115 S.Ct. 797, 803,130 L.Ed.2d 697, 706.
Prudent defense counsel will address the plea bargain in cross-examination in order to show possible bias on the part of the witness that might affect the witness' credibility. See State v. Simms
(1983), 9 Ohio App.3d 302, 9 OBR 549, 459 N.E.2d 1316. The mere fact that a witness is testifying pursuant to a plea bargain does not mean the testimony is not credible. The credibility of a witness is primarily an issue for the trier of fact to resolve. State v. Green (2000),90 Ohio St.3d 352, 357, 738 N.E.2d 1208, 1219. We will not hold accomplice testimony procured via a plea agreement is per se false and perjured testimony. Rather, we will leave that determination to the trier of fact in each particular case.
Appellants also claim the prosecutors were guilty of misconduct by repeatedly vouching for the credibility of the accomplices who gave testimony linking Appellants to the crimes. However, Appellants fail to reference any portion of the more than 2,300 pages of the transcript where this allegedly occurred and concede no objection was made to any alleged prosecutorial misconduct. Because of Appellants' failure to either identify the portion of the record upon which they rely in alleging prosecutorial misconduct or object at trial, as discussedsupra, App.R. 12 precludes us from addressing this assignment of error. Appellants' fourth assignment of error is meritless.
In their fifth assignment of error, Appellants argue:
 "The Trial Court Erred and Abused its Discretion by Permitting the State to Pose Leading Questions to George Wilkins."
Appellants claim the state, without requesting he be declared a hostile witness, elicited testimony from Wilkins during direct examination through leading questions. Appellants provide seventeen specific instances where this allegedly occurred in the record, but allege that as many as 230 of 524 questions were in fact leading questions.
As stated supra, this court need only address the portions of the record Appellants cite in their brief to support their arguments. App.R. 12(A)(2). Furthermore, at trial Appellants objected to only two of the questions mentioned in their brief. A reviewing court will not consider errors that counsel did not timely call to the attention of the trial court so the error could have been avoided or corrected at trial. SeePeagler, supra. Failure to object waives the issue on appeal unless the error is determined to be plain error pursuant to Crim.R. 52(B). Burrow,supra. Plain error is only invoked to prevent a manifest miscarriage of justice. Long, supra.
Appellants objected to the following questions, excerpted from the trial transcript:
Did you and Mr. Turnage ever commit crimes together?
 Did Mr. Riddle ever indicate whether or not Mr. Altschuler was involved in this?
 Did Mr. Riddle ever indicate who was giving him orders?
 To your knowledge, was anybody indicating to him that they could help him with his case?
 Okay. Did there come a point in April, May of 1996 that Mr. Riddle indicates that people are getting anxious, that they want Ernie Biondillo killed quickly?
 Did Mr. Riddle indicate to you that he was feeling any pressure from anybody about this?
 Mr. Wilkins, who, if anyone, indicated to you that there was pressure on-I'm sorry. Who, if anyone, did Mr. Riddle indicate was putting pressure on him?
 Sir, did you not want to use your own cars because you felt using stolen cars would make getting caught less easy?
 Did either you, Mr. Turnage or Mr. Riddle feel that it was appropriate to kill Mr. Gains at that time?
Appellants argue the trial court abused its discretion by allowing these leading questions to be asked on direct examination.
 "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." Evid.R. 611(C).
"The allowing or refusing of leading questions in the examination of a witness must very largely be subject to the control of the court, in the exercise of a sound discretion. In the absence of an abuse of discretion, the trial court's ruling must stand." Ramage v. Central OhioEmergency Serv., Inc. (1992), 64 Ohio St.3d 97, 592 N.E.2d 828, paragraph six of the syllabus.
Evidence of a long-term relationship between a witness and the defendant or another reason for a strong affinity between a witness and defendant may be a sufficient basis for a court to allow the State to ask leading questions of a witness on direct examination. See State v. Dolce
(1993), 92 Ohio App.3d 687, 703, 637 N.E.2d 51, 62; State v. Stearns
(1982), 7 Ohio App.3d 11, 14, 7 OBR 12, 15, 454 N.E.2d 139, 143.
After examining the testimony both preceding and following the leading questions, the prosecutor clearly was not "putting words" into the witness' mouth. Wilkins either gave foundational testimony prior to the questions asked or gave detailed responses to subsequent questions which indicates he testified from his own knowledge of the facts. In addition, Wilkins testified to knowing and associating with each of Appellants. The trial court did not abuse its discretion when it allowed the State to ask these leading questions on direct examination. Therefore, Appellant's fifth assignment of error is meritless.
In Appellants' sixth assignment of error, they argue:
 "The Trial Court Erred When it Failed to [sic] a Change of Venue, Thus Depriving Appellant of a Fair Trial Guaranteed by U.S. CONST. amend. VI and XIV and OHIO CONST. art. I, sec. 1, 2, 5, 10, and 16; That Error, Combined With Ineffective Assistance, Deprived Appellant of Due Process."
Within this assignment of error, Appellants argue not only was counsel ineffective for failing to request a change of venue, the trial court erred by not changing venue before attempting to seat a jury. As an initial matter, we note Riddle's attorney did, in fact, move for a change of venue on February 16, 1999. The trial court denied this motion stating, "it should be obvious, if I have not otherwise ruled, that I have implicitly denied the motion for change of venue, both the prosecutor's motion and the motion by at least two of the defendants." Consequently, Appellants did receive effective assistance of counsel in that regard and their argument is meritless.
Appellants make the additional assertion, however, that the trial court erred by not granting a change of venue in this case, claiming the amount of news coverage this case received warranted a change. Appellants argue "this `Mob trial' was one of the most publicized trials in the history of the Mahoning Valley." Although this statement may in fact be true, Appellants provided no evidence relating to media coverage. The only evidence before this court is the responses given by the venire.
Crim.R. 18(B), provides:
 "Upon the motion of any party or upon its own motion the court may transfer an action to any court having jurisdiction of the subject matter outside the county in which trial would otherwise be held, when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." See, also, R.C. 2901.12(J).
Any decision on a change of venue rests in the sound discretion of the trial court. State v. Landrum (1990), 53 Ohio St.3d 107, 116,559 N.E.2d 710, 722.
Crim.R. 18(B) does not require a change of venue merely because of extensive pre-trial publicity. Id. at 116-117, 559 N.E.2d at, 722-723. Even if virtually all of the prospective jurors had read or heard media reports about the case, a court need not grant a change of venue if "each empaneled juror confirmed that he or she had not formed an opinion about the guilt or innocence of the accused, or could put aside any opinion, and that he or she could render a fair and impartial verdict based on the law and evidence." State v. Treesh (2001), 90 Ohio St.3d 460, 464,739 N.E.2d 749, 759; see also Landrum, supra. "[A] careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality." State v. Bayless (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 262, 357 N.E.2d 1035, 1051.
 "In the absence of a clear and manifest showing by the defendant that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury would be a vain act, and in the interest of judicial economy, convenience and [reducing] expense to the taxpayer, a good faith effort should be made to impanel a jury before the trial court grants a motion for change of venue." State v. Herring (1984), 21 Ohio App.3d 18, syllabus.
"A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased. Mayola v.Alabama (C.A.5, 1980), 623 F.2d 992, 996. Only in rare cases may prejudice be presumed. Id. at 997; see also, Nebraska Press Assn. v.Stuart (1976), 427 U.S. 539, 554-555, 96 S.Ct. 2791, 2800-2801,49 L.Ed.2d 683, 694-695." Treesh, supra at 464, 739 N.E.2d at 759.
In the present case, although Appellants reference several statements made by potential jurors, they neglect to cite any instances whereseated jurors displayed any impartiality. Moreover, the record reflects nine out of forty-nine potential jurors did not have any recognition of the circumstances in this case.
The only seated juror Appellants specifically complain of is a Ms. Blackiston. This juror admitted she had heard about the case on the television and radio. However, she went on to state, "I can't say until I hear what the lawyers are going to-how they're going to defend their client. What are they going to say? There had to be a lot of just hearsay on the radio." She further explained, "I'm not making a decision because of what I've heard on the radio, and that's the truth." This juror confirmed she had not formed an opinion about Appellants' guilt or innocence and she could render a fair and impartial verdict based on the law and evidence. Pursuant to Treesh and Landrum, the trial court did not abuse its discretion when it refused to grant the change of venue. Appellants' sixth assignment of error is meritless.
In their seventh and final assignment of error, Appellants argue:
 "The Cumulative Effect of Errors Denied Appellant a Fair Trial and Due Process; Accordingly, Neither His Conviction Nor Death Sentence May Stand Under U.S. CONST. amend. XIV and OHIO CONST. art. I, 1, 2, 9, 10, and 16."
At oral argument upon inquiry by the court, Appellants moved to strike the second portion of this assignment of error as they were not given death sentences, which we granted. Therefore, in this assignment of error Appellants ask this court to examine all of the errors as a whole and decide whether, based on their cumulative effect, Appellants were afforded a fair trial.
"[A] conviction will be reversed where the cumulative effect of errors during the course of a trial deprives a defendant of the constitutional right to a fair trial." State v. DeMarco (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256, paragraph two of the syllabus. The doctrine of cumulative error is not applicable in the event appellant fails to establish multiple instances of harmless error during the course of the trial. State v. Garner (1995), 74 Ohio St.3d 49, 64, 656 N.E.2d 623,637. In this case, we have not found any error, let alone harmless error. Therefore, the doctrine of cumulative error does not apply in this case. Appellants' seventh assignment of error is meritless.
For the foregoing reasons, we find each of Appellants' assignments of error to be meritless and affirm the judgment of the trial court.
Vukovich, P.J., Concurs.
Waite, J., Concurs.