**UNITED STATES, Appellee,**

v.

**Specialist Four Ronald A. GRAY,
261–69–7258, United States
Army, Appellant.**

**ACMR 8800807.**

U.S. Army Court of Military Review.

15 Dec. 1992.

JAGC, Major James M. Heaton, JAGC, Captain Jon W. Stentz, JAGC, Captain Keith W. Sickendick, JAGC, Captain Cynthia Wright, JAGC, Captain Jeffrey J. Fleming, JAGC, Captain Michael E. Smith, JAGC (on brief).

For Appellee: Captain Glenn L. Kirschner, JAGC (argued), Colonel Alfred F. Arquilla, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Major Gary L. Hausken, JAGC, Major Timothy W. Lucas, JAGC, Captain Jonathan F. Potter, JAGC, Captain Randy V. Cargill, JAGC, Captain Donald W. Hitzeman, JAGC (on brief).

Before NAUGHTON, GRAVELLE and JOHNSTON, Appellate Military Judges.

## OPINION OF THE COURT AND ACTION ON PETITION FOR NEW TRIAL

NAUGHTON, Senior Judge:

A general court-martial composed of officer and enlisted members convicted the appellant, at Fort Bragg, North Carolina, contrary to his pleas, of attempted murder, premeditated murder (two specifications), rape (three specifications), larceny, robbery (two specifications), forcible sodomy (two specifications), and burglary, in violation of Articles 80, 118, 120, 121, 122, 125, and 129, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 918, 920, 921, 922, 925, and 929 (1982) [hereinafter UCMJ], respectively.[1] The appellant was sentenced to be reduced to Private E1, to forfeit all pay and allowances, to be dishonorably discharged, and to be put to death. The convening authority approved the sentence.

The appellant asserts twenty-seven assignments of error and questions the appropriateness of the sentence. Several of the issues raised have been resolved

For Appellant: Captain Michael J. Berrigan, JAGC (argued), Colonel Robert B. Kirby, JAGC, Lieutenant Colonel Russell S. Estey, JAGC, Major Michael J. Kelleher,

---

1. Prior to his court-martial, pursuant to a pretrial agreement, the appellant pleaded guilty in the Cumberland County, North Carolina, Superior Court on 2 November 1987, to two counts of second degree murder, two counts of first degree burglary, five counts of first degree rape, five counts of first degree sexual offense, attempted first degree rape, three counts of second degree kidnapping, two counts of robbery with a dangerous weapon, and assault with a deadly weapon with the intent to kill, and inflicting serious injury. The appellant was sentenced to three consecutive life terms and five concurrent life terms. These offenses involved different victims and the state proceeding was wholly separate from the appellant's court-martial.

against the appellant by the Court of Military Appeals and will not be discussed in this opinion.[2] *See United States v. Curtis,* 32 M.J. 252 (C.M.A.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991), *remanded,* 33 M.J. 101 (C.M.A. 1991). We find no error that prejudices the appellant's substantial rights, specifically find the sentence to death appropriate, and affirm the findings of guilty and the sentence.

### I. Procedural History

The appellant's trial concluded on 12 April 1988 and the convening authority took action on the appellant's case on 29 July 1988. The record of trial was received in the Defense Appellate Division on 8 August 1988 and the original defense pleading was filed on 15 September 1989. The initial government answer was filed on 20 July 1990. In response to motions from both the appellant (22 December 1989) and the appellee (2 January 1990), on 13 February 1990, this Court ordered an inquiry into the appellant's mental responsibility at the time of the offenses, his mental capacity at the time of his court-martial, and his current mental capacity. *United States v. Gray,* ACMR 8800807 (A.C.M.R. 13 Feb. 1990) (order) (unpub.). A sanity board convened on 29 June 1990, at the U.S. Disciplinary Barracks, Fort Leavenworth, Kansas. The board unanimously found that:

(a) the appellant did not suffered [sic] from a severe mental disease or defect at the time of the offenses for which he has been convicted; (b) the appellant was able to appreciate the nature and quality or wrongfulness of his conduct at the time of the alleged criminal conduct; (c) the appellant has [sic] sufficient mental capacity to understand the nature of the court-martial proceedings and to conduct or cooperate intelligently in his defense at the time of the trial; and, (d) the appellant presently possesses sufficient mental capacity to understand the nature of the pending appellate proceedings and to conduct or cooperate intelligently in his appeal.

On 27 December 1990, the appellant filed a motion requesting that this Court order the U.S. Government to provide funds in the amount of $15,000.00 to hire an expert psychiatrist, a death-penalty-qualified attorney, and an investigator. We interpreted this motion to be a petition for extraordinary relief in the nature of a writ of mandamus, heard oral argument on the "motion" in January 1991, and, on 12 March 1991, denied the request for funding. *United States v. Gray,* 32 M.J. 730 (A.C.M.R.1991).[3]

In April 1991, the appellant requested time to properly investigate the case and prepare supplemental pleadings. This mo-

---

**2.** The appellant contends that Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 1004 [hereinafter R.C.M.] is invalid on the grounds that the President exceeded his authority in promulgating R.C.M. 1004; that R.C.M. 1004 deprives the appellant of equal protection; that R.C.M. 1004 fails to protect the appellant against racially motivated imposition of the death penalty; and that the aggravating factor in R.C.M. 1004(c)(7)(I) is too vague. The appellant also contends that his court-martial in a capital case by a panel composed of less than twelve members violated his rights to equal protection and due process.

With respect to the contention concerning the aggravating factor in R.C.M. 1004(c)(7)(I), this Court held in *United States v. Murphy,* that R.C.M. 1004(c)(7)(I) was a constitutionally valid aggravating circumstance. 30 M.J. 1040, 1058 (A.C.M.R.1990), *remanded, United States v. Murphy,* 36 M.J. 8 (C.M.A. 14 Apr. 92) (order). The Court, however, did state that the sentencing procedure would be constitutional only if the

court members were adequately instructed. *Id.* In the case *sub judice,* the judge failed to explain what was intended by R.C.M. 1004(c)(7)(I). In *Murphy,* the Court held the judge's explanation was inadequate, but the error was not fatal to the sentencing process because there were other aggravating factors present which were unaffected by the error. 30 M.J. at 1059. Similarly, the other aggravating factors in the appellant's case render this error harmless.

**3.** This Court also held that the appellate defense counsel was "qualified" within the meaning of Articles 27 and 70, UCMJ, 10 U.S.C. §§ 827, 870, to represent the appellant on appeal in a capital case. *Gray,* 32 M.J. at 733–36. Moreover, assuming the prevailing standards for death-penalty-qualified defense attorneys established by the 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases were to apply, "the appellant's counsel satisfies those standards as well." *Id.* at 734.

tion was denied and oral argument was scheduled for 31 July 1991. On 3 July 1991, the appellant moved to delay the oral argument. The motion was granted. In August 1991, the appellant renewed his request for funding for an expert psychiatrist and an investigator. We denied the motion on 23 August 1991.

On 12 September 1991, the appellant filed a writ appeal petition with the United States Court of Military Appeals for review of the decision of the Army Court of Military Review on the petition for extraordinary relief in the nature of a writ of mandamus to order the government to provide $10,000.00 to be used by appellate defense counsel to retain a mental health expert and a qualified investigator to evaluate appellant and for an emergency stay of the proceedings in this Court. The Court of Military Appeals denied the writ appeal petition and application for emergency stay on 18 October 1991. *United States v. Gray*, 34 M.J. 164 (C.M.A.1991) (summary disposition).

The appellant then requested the oral argument, set for 30 October 1991, be postponed to allow the appellant time to file a brief on the issue of proportionality and to prepare additional assignment of errors. This Court granted the motion, and in an order dated 24 October 1991, set argument for 13 November 1991.

On 7 November 1991, the appellate defense counsel filed a motion to withdraw from the case because he was not competent to represent the appellant. We denied this motion.[4]

On 16 December 1991, the appellant requested that we order military authorities to perform additional medical and neuropsychological tests. This Court issued an order on 31 December 1991, requiring the requested tests be completed by 1 February 1992.[5] On 26 February 1992, the appellant filed a supplementary assignment of errors and brief (in excess of fifty pages) which was answered by the appellee on 27 March 1992. We heard oral argument on 8 April 1992.

## II. FACTS

In January 1987, Ms. B notified civilian authorities that she had spotted the male who had raped her in the vicinity of the Fairlane Acres trailer park located near Fort Bragg, North Carolina. Subsequently, the authorities set up a stakeout of the trailer park. On 6 January, the authorities observed the appellant with a dark bundle underneath his arm. When the authorities apprehended the appellant, he no longer had the bundle; however, authorities found a pair of black karate or "ninja" pants close by in a garbage can. A portion of the cloth belt strap was missing from the pants. The appellant denied committing any offenses and invoked his right to counsel.

Later that same evening, Ms. R's roommate became concerned that her roommate might be missing. The roommate told the authorities that Ms. R, a cab driver for the Terminal Cab Company, had told her she was going to pick up a $2,000.00 special fare named "Ron" at the trailer park to provide transportation for a drug transaction. Ms. R also told her roommate she was picking up the same "Ron" who had hired her as a driver the previous day. The taxi company logs revealed that Ms. R had picked up an individual the previous day at the appellant's address. Early in the morning of 7 January 1987, two Military Policemen (MPs) on routine patrol spotted a taxicab parked off No Name Road, on Fort Bragg, in the treeline. The Terminal Cab Company revealed that a Ms. R had been

---

4. We found again the defense counsel was qualified and competent to represent the appellant, *United States v. Gray*, ACMR 8800807 (A.C.M.R. 12 Nov. 1991) (order) (unpub.). *See* Appendix A.

5. This Court ordered the following tests be performed on the appellant:
 (a) A Magnetic Resonance Imaging (MRI) scan of the appellant's brain;
 (b) A 20–channel, scalp electrode, sleep deprived EEG;
 (c) A SPECT scan of appellant's brain; and
 (d) A complete battery of intellectual, neuropsychological, academic, psychological, and personality tests performed by a fully qualified and credentialed neuropsychologist.
 See Part XIV of this opinion for a discussion of the results.

driving the cab that night. A few hours later the authorities discovered Ms. R's body in the woods not far from her taxi cab. The body was lying face down in a wooded area. The body was nude except for a pair of socks. Ms. R had been gagged with the black cloth belt strap from the appellant's "ninja" pants, and her hands had been tied behind her back. She had received multiple stab wounds. She also suffered bruises on her eyebrow, bruises on her nose, and a laceration on her lip. Swabs taken from her vagina and anus revealed that she had been raped and sodomized. The appellant's fingerprints were found on the interior door handle of Ms. R's taxi, and money in his possession at the time of his arrest was found to have Ms. R's fingerprints on it.

On 17 January 1987, a soldier looking for an injured deer discovered the half-naked, decomposed body of Private (PVT) V–C, who had been missing from Fort Bragg since 15 December. She had been shot four times (while she was alive), in the neck, forehead, chest, and back of the head. Also, she had suffered blunt force trauma to the right cheek, the left side of her face, around her left eye, her left breast, abdomen, and both legs and arms. PVT V–C had been raped and anally sodomized. On the date she disappeared, her First Sergeant saw her with a man in "cook whites" at the K–Mart on Fort Bragg Boulevard. Her First Sergeant identified the man as the appellant. PVT V–C's car, found a block from her mobile home, appeared to have been driven through the woods. The driver's seat was pushed back farther than needed for PVT V–C to drive. Three fingerprints matching the appellant's were found on the hood of PVT V–C's car. The murder weapon (a .22–caliber pistol) was found approximately sixty feet from PVT V–C's body. The murder weapon had been previously stolen by the appellant.[6]

After the appellant's arrest, photographs of his face appeared in the local newspaper and on television. While recovering in the hospital, a PVT N reported that the appel-

lant looked like the same man who had raped her in her barracks room at Fort Bragg. According to PVT N, she saw the appellant leave a message for another soldier on a note pad on the door immediately across from her barracks room. The message was, "Ronnie was here. I be back." The appellant then asked to use her bathroom. Upon exiting the bathroom, the appellant grabbed her, held a knife to her throat, and asked for her TA–50 field gear. She testified that the appellant tied her hands behind her back with the cord from a curling iron. He then removed her underclothing, raped her, and stabbed her repeatedly in the neck and side. When he left he told her not to scream or he and his buddy would come back and kill her. PVT N suffered a laceration of the trachea and a collapsed or punctured lung.

## III. GRANTING OF CHALLENGES FOR CAUSE

The government challenged both Master Sergeant (MSG) M and Command Sergeant Major (CSM) W for cause, citing their opposition to the death penalty as justification. The military judge granted both challenges. The appellant contends that the granting of the challenges was improper because both members stated they were willing to follow the instructions of the military judge despite their individual views on the death penalty.

█ As to MSG M, the appellant asserts that the granting of the challenge was improper because he never indicated that he was "irrevocably committed ... to vote against the death penalty regardless of the facts and circumstances...." *Gray v. Mississippi*, 481 U.S. 648, 657, 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987) (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 522, n. 21, 88 S.Ct. 1770, 1777, n. 21, 20 L.Ed.2d 776 (1968)). The appellant has applied the incorrect standard. The present standard is whether the member's views would "prevent or substantially impair the performance of his duties as a juror...." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct.

---

**6.** On 12 November 1986, the appellant unlawfully entered a mobile home in the Fairlane Acres trailer park and stole several items, including a .22–caliber pistol.

844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); *see also Morgan v. Illinois*, —— U.S. ——, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); *United States v. Curtis*, 33 M.J. 101, 107 (C.M.A. 1991). In *Wainwright*, the Court recognized that a juror's bias cannot always be proven with unmistakable clarity, therefore the Court held deference must be paid to the trial judge who sees and hears the juror on voir dire. 469 U.S. at 424, 426, 105 S.Ct. at 852, 853. In this case, the military judge's granting of the challenge is sufficiently supported by the record and bears a presumption of correctness. *Id.* at 428–29, 434, 105 S.Ct. at 854, 857.

■ During voir dire, MSG M stated he was opposed to the death penalty and would be able to vote for it only in very extreme circumstances. The following responses given by MSG M to the trial counsel indicate that it is highly unlikely that MSG M would find a situation deserving of the death penalty:

TC: Could you be part of the legal machinery—could you be part of a jury here that would impose the death penalty?

MSG M: Well, sir, I'd—I'd have to—you know, I'd really have to do a lot of soul searching to do that. I really can't, at this point, actually say I can, but I mean—I'd do what I felt was necessary, sir.

. . . . .

TC: So,—but you can conceive of circumstances that would make you vote for the death penalty. Is that right?

MSG M: Yes, sir, extreme circumstances, sir.

. . . . .

TC: And that is, given your opposition and your personal belief that the death penalty—or your personal belief that you oppose the death penalty and the fact that a vote in a court-martial is something that's personal, a personal decision that you have to make, could you actually—could you vote for the death penalty under any circumstances?

MSG M: (Pause)

TC: You see what I'm getting to?

MSG M: Yes, sir, I see what you're getting to, sir, but on a very remote—under very remote circumstances, sir.

In CSM W's case, the appellant claims that CSM W was willing to set aside his personal beliefs and follow the instructions of the military judge, to include recommending a death sentence. Therefore, the military judge incorrectly granted the challenge for cause. The record shows CSM W's answers were ambiguous at best. He stated more than once that he could not vote for the death penalty:

TC: Let me just ask you this: how do you feel about the death penalty? Do you oppose the death penalty?—or do you think it's a good law?

CSM W: The bible says "Thou shalt not kill," sir.

TC: Could you be part of the legal machinery that could bring about the imposition of the death penalty? Now, when I say that I mean, could you be part of a jury that voted to impose the death penalty?

CSM W: I could be within the system, sir, on the jury, but—but being a part of that jury and that decision-making, if that's the question that you're asking me, sir, I don't think I could, sir.

. . . . .

MJ: Could you ever vote for the death penalty? Yes or no?

CSM W: No, sir.

"The Government need only establish the great likelihood that, because of his religious views or moral scruples, the juror would not be able to give meaningful consideration to imposing a death penalty." *Curtis*, 33 M.J. at 107. The military judge found that in both cases the prosecution satisfactorily established the above, and we agree.

## IV. PEREMPTORY CHALLENGE PROCEDURE IN COURTS–MARTIAL

■ The appellant contends that the peremptory challenge procedure in the military justice system, which allows the gov-

ernment to remove any one court member without cause, constitutes an unconstitutional violation of the Fifth and Eighth Amendments in capital cases, in which the prosecutor is free to remove a member whose moral bias against the death penalty does not justify a challenge for cause. We do not agree.

Concurring with an order denying a petition for certiorari, Justice O'Connor stated that "permitting prosecutors to take into account the concerns expressed about capital punishment by prospective jurors, or any other factor in exercising peremptory challenges simply does not implicate the concerns expressed in *Witherspoon [supra]." Brown v. North Carolina,* 479 U.S. 940, 941, 107 S.Ct. 423, 424, 93 L.Ed.2d 373 (1986), *denying cert. to,* 345 S.E.2d 393 (N.C.1986). The purpose served by the peremptory challenge is freedom from any bias against the accused but also from prejudice against the prosecution. *Swain v. State of Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *see United States v. Loving,* 34 M.J. 956, 968 n. 15 (A.C.M.R.1992) (recognition that *Swain* is limited by *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)). Here, the prosecution's peremptory challenge did not violate the Constitution.

## V. GOVERNMENT PEREMPTORY CHALLENGE

The appellant next contends that the military judge failed to comply with *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *United States v. Moore,* 28 M.J. 366 (C.M.A.1989), *rev'd on other grounds,* 30 M.J. 162 (C.M.A.1990) (summary disposition), when he refused to have the trial counsel articulate on the record a race-neutral explanation for the government's peremptory challenge of one of the two black court members.

■ When the government used its peremptory challenge to remove one of the two black court members, the defense counsel demanded an explanation on the record. Although the trial counsel offered to articulate the reason for the challenge, the military judge stated one was not nec-

essary. We agree with the appellant that the trial counsel must articulate a race-neutral explanation for a peremptory challenge if objected to by the defense. *Batson,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Moore,* 28 M.J. 366 (C.M.A.1989) (per se rule adopted; when the accused is a member of a recognized racial group and the government uses a peremptory challenge on a member of that racial group and the accused objects, the government is required to provide an explanation). The trial counsel did, however, provide a statement at the next court session, stating a race-neutral explanation for the challenge, to wit, the member's responses concerning the death penalty were equivocal. This statement was included in the record as Appellate Exhibit LVIII. A statement included in the record is sufficient as long as it provides the court with a complete explanation for the challenge. *Moore,* 28 M.J. at 366, 368 n. 6–7. The trial counsel's statement provides a sufficiently race-neutral explanation for the challenge, and we find that public confidence in the military justice system has not been undermined. We therefore find the appellant's assertion to be without merit.

## VI. FORUM SELECTION

■ The appellant asserts that the military judge failed to determine properly, and the evidence of record fails to show conclusively, the appellant's election as to forum was knowingly and intelligently made. This assertion has no merit.

The appellant was advised of his forum rights twice. When the military judge asked if he had any questions regarding forum, the appellant answered in the negative. The appellant verbally stated he elected enlisted panel members, and he signed a form so indicating (*see* Appellate Exhibit XXIV).

## VII. ADMISSIBILITY OF PHOTOGRAPHS

■ The appellant contends that the military judge erred to the substantial prejudice of the appellant in a capital case by the admission in evidence of gruesome photo-

graphs of the corpses, including Prosecution Exhibit 214 which is a photograph of a victim's badly decayed face, with a gunshot wound to the eye socket. This contention has no merit.

At trial, the only photographs objected to by the defense counsel on the basis that they were too gruesome were Prosecution Exhibits 213, 214, and 215. With regard to the other photographs, although the defense counsel requested black and white copies be substituted for the color photographs, he did not state they should be excluded because they were too gruesome. After an Article 39(a) session in which the expert testified about how he would use the photographs, the military judge admitted all the photographs except Prosecution Exhibit 215. The military judge stated that Prosecution Exhibit 215 was too gruesome and was cumulative with Prosecution Exhibit 214. The expert testified Prosecution Exhibit 214 showed the characteristics of the wounds.

■ Photographs, although gruesome, are admissible if used to prove time of death, identity of the victim, or exact nature of wounds. *United States v. Murphy*, 30 M.J. 1040 (A.C.M.R.1990); *United States v. Whitehead*, 30 M.J. 1066 (A.C.M.R.1990). It is not a matter of whether the photographs were inflammatory but whether they served a legitimate purpose. *Whitehead*, 30 M.J. at 1070, quoting *United States v. Bartholomew*, 3 C.M.R. 41, 48 (C.M.A.1952). In *United States v. Redmond*, 21 M.J. 319 (C.M.A. 1986), *cert. denied*, 476 U.S. 1105, 106 S.Ct. 1950, 90 L.Ed.2d 359 (1986), the court held that the military judge's decision to admit a skull would not be overturned absent a clear abuse of discretion. Further, the Court did not believe that experienced officers on the panel would have been significantly influenced by the admission of the skull.

■ In the case *sub judice*, the photographs' probative value outweighed any prejudicial effect, and they were admissible on the merits. We find the military judge did not abuse his discretion in admitting these photographs. Furthermore, the pho-

tographs were not mentioned during sentencing. In that regard, we also find that these photographs were not unduly inflammatory on sentencing and did not cause the court members to impose the death penalty in violation of the Eighth Amendment of the Constitution.

## VIII. VICTIM IMPACT ARGUMENT

The appellant contends that the military judge erred to the substantial prejudice of the appellant by allowing the prosecution, during the sentencing portion of a capital case, to engage in improper argument that emphasized victim impact statements in violation of *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).

■ A recent Supreme Court decision, however, has overruled the *Booth* case as well as *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), which the defense also relies upon. *Payne v. Tennessee*, —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The Court said the Eighth Amendment did not erect a per se bar prohibiting a capital sentencing jury from considering victim impact evidence relating to the victims's personal characteristics and the emotional impact of the murder on the victim's family, or precluding a prosecutor from arguing such at a sentence hearing. Also, in the appellant's case, the trial defense counsel made no objection at trial; and therefore, the error was waived. Manual for Courts-Martial, United States, 1984, Rule for Courts-Martial 1001(g) [hereinafter R.C.M.].

## IX. TENURE FOR MILITARY JUDGES

■ The appellant contends that due process requires that trial and intermediate appellate judges in a peacetime military death penalty case have the protection of a fixed term of office. We do not agree.

In *Palmore v. United States*, 411 U.S. 389, 404, 93 S.Ct. 1670, 1679, 36 L.Ed.2d 342 (1973), the Supreme Court stated:

Under its Article I powers to legislate for the District of Columbia, Congress could provide for trying local criminal cases

before courts with judges who did not have Article III tenure and salary protection, there being no constitutional requirement that an Article III judge must preside over every proceeding, including criminal proceedings, in which charge, claim, or defense was based on an Act of Congress or a law made under its authority.

Congress has also created a military judicial system to try cases of criminal misconduct committed by members of the Armed Forces, *i.e.*, courts-martial established under Article I of the Constitution, not by federal courts established under Article III. *Id.* The Court further noted, "[T]he Constitution does not provide for life tenure for those performing judicial functions in military trials." *Id.*, *quoting United States ex rel. Toth v. Quarles*, 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955). The Court of Military Appeals in a recent decision unanimously held that fixed terms of office for the trial and intermediate appellate judges are not required under the due process clause of the Constitution. *United States v. Graf*, 35 M.J. 450 (C.M.A.1992). *See also United States v. Loving*, 34 M.J. 956, 969 (A.C.M.R.1992) ("[a]lthough the establishment of a fixed term of office for those performing military judicial functions may be desirable, it is not a Constitutional requirement, but it is a policy matter to be determined by the President, Congress, or each military service.").

## X. GOVERNMENT'S USE OF APPELLANT'S STATEMENTS MADE PURSUANT TO A GUILTY PLEA AGREEMENT IN A CIVILIAN TRIAL

In three related assignments of error, the appellant contends: (1) that the military judge erred to the substantial prejudice of the appellant by allowing the government to use the appellant's statements (Prosecution Exhibits for Identification 19–21) made pursuant to a guilty plea in Cumberland County, North Carolina, where (a) civilian authorities thought it unnecessary to ad-

vise the appellant of his *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), rights, (b) the parties did not contemplate use of the statement unless the appellant pleaded guilty at the civilian trial, (c) the military defense counsel were not present when the statement was rendered, and (d) the civilian defense counsel should have known that military authorities had preferred charges against the appellant, with a view towards the death penalty; (2) the military judge erred by allowing the government to make use of the appellant's statements in violation of a civilian plea agreement; and (3) the civilian defense counsel were ineffective in failing to limit the appellant's statements made pursuant to a civilian plea agreement, or alternatively, in failing to draft terms limiting the use of such statements to the civilian trial. These contentions have no merit.

First, the plea agreement and the appellant's statements were neither offered as evidence nor admitted at the military courts-martial.[7] Second, the plea agreement with the state is not rendered involuntary or violated just because the appellant was uninformed about the possibility of a subsequent military prosecution. *See United States v. Jordan*, 870 F.2d 1310 (7th Cir.1989), *cert. denied*, 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989). Thus, there is no error in allowing such an agreement to be used in a subsequent federal or military trial. *Id.; see also United States v. Sandate*, 630 F.2d 326 (5th Cir.1980), *cert. denied*, 450 U.S. 922, 101 S.Ct. 1372, 67 L.Ed.2d 351 (1981). Third, the attorney's failure to advise his client that there was a possibility of federal (or military) prosecution is not ineffective assistance of counsel. *See United States v. Jordan*, 870 F.2d at 1318. To prove such ineffectiveness, the appellant must offer proof that his attorney did not inform him of such possibilities and that he would not have pleaded guilty but for the incompetence. *Id.* In any event, as the statements were never admitted and were never brought to

---

7. *But see United States v. Howze*, 668 F.2d 322, 324 n. 3 (7th Cir.1982) (the use of a valid guilty plea at a collateral proceeding to prove an element of the crime charged may create a constitutional problem).

the attention of the court members, their mere existence could not have contributed to the findings and sentence in the appellant's court-martial.

## XI. MULTIPLICITY

 The appellant contends that the military judge failed to instruct the panel members that the Specification of Charge IV (larceny) was multiplicious for sentencing purposes with the Specification of Charge VII (burglary). We find that the military judge did not err.

One of the elements of burglary is that it is done with the intent to commit an offense. Manual for Courts–Martial, United States, 1984, para. 55c(7) [hereinafter MCM, 1984] provides that if the evidence warrants, the intended offense can be charged separately from the offense of burglary. Additionally, such offenses are also separately punishable. *See United States v. Ruiz*, 30 M.J. 867 (N.M.C.M.R. 1990); *United States v. Beaver*, 26 M.J. 991 (A.F.C.M.R.1988).

Under the circumstances of this case, even if the multiplicity claim was meritorious, there is no harm since the appellant was sentenced to death for the murders and this Court concludes the panel would not have reduced the sentence if they had been instructed that the two specifications were multiplicious.

## XII. INSTRUCTIONS ON AGGRAVATION FACTORS

The appellant asserts that the military judge erred by failing to instruct the panel that a single act cannot be considered as two aggravating factors when weighing aggravating factors against any mitigating factors. Citing *People v. Harris*, 36 Cal.3d 36, 201 Cal.Rptr. 782, 679 P.2d 433 (1984), *cert. denied*, 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984), the appellant lists aggravating factors which have been found to be duplicitous in the consideration of the death penalty: murder in commission of robbery with a murder for pecuniary gain; commission of a capital felony during a robbery with a capital felony for pecuniary gain. In addition, relying on *United States v. Curtis*, 33 M.J. at 108, the appellant asserts that a double murder should count as only one aggravating factor, not as two.

 It is clear from the sentencing worksheet (Appellate Exhibit CII) that the panel found the government had proven the existence of five aggravating factors.[8] Contrary to the appellant's assertion, each aggravating factor was properly considered as none of the five can be considered duplicitous with the other.

 Even if we agreed that the military judge erred by failing to instruct the panel that one act cannot be considered as two aggravating factors, this Court can affirm the sentence to death if we determine the sentence would have been the same had the instruction been given. *See Stringer v. Black*, —— U.S. ——, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). In addition, the appellate court can conduct an independent review of the record, reweigh the mitigating and aggravating factors and conclude that the death penalty is warranted. *See Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); *see also United States v. Curtis*, 33 M.J. 101, 108 (C.M.A.1991) (the potential double counting of aggravating factors should be considered by the Navy–Marine Corps Court of Military Review to determine whether the double counting had any effect on the sentence to death).

We find that none of the five aggravating factors were duplicitous. We have conducted an independent review of the

---

8. The five aggravating factors found were (1) the premeditated murder of PVT V–C was committed while the accused was engaged in the commission of a rape or sodomy; (2) the premeditated murder of PVT V–C was preceded by the intentional infliction of substantial mental and physical pain and suffering of the victim; (3) the premeditated murder of Ms. R was committed while the accused was engaged in the commission of a rape or sodomy; (4) the premeditated murder of Ms. R was preceded by the intentional infliction of substantial mental and physical pain and suffering of the victim; and (5) the accused has been convicted in the same case of more than one violation of Article 118, UCMJ.

record and reweighed the aggravating factors and the mitigating evidence. We find that the death sentence is warranted. Therefore, the appellant's assertion of error is without merit.

## XIII. PAGE LIMIT ON BRIEFS

The appellant contends that this Court's refusal to waive the fifty-page limit on assignments of error and briefs set forth in this court's internal operating procedure constitutes a violation of the appellant's right to due process as established by Article 66(c), UCMJ, 10 U.S.C. § 866(c). The appellant further contends the page limitation violates the appellant's right to the effective assistance of counsel on this first appeal as of right by preventing detailed counsel from fully presenting the appellant's appeal for the review mandated by Congress. We disagree.

Although the former senior judge of this panel refused to grant a waiver of the fifty-page limit on assignments of error and briefs, this Court, as currently composed, has considered all of the filings by appellate defense counsel, including supplementary assignments of error and the excessively lengthy brief they initially sought to file. To date the total defense filings exceed several hundred pages.

## XIV. PETITION FOR NEW TRIAL

The appellant contends that in light of new evidence establishing he is suffering from organic brain damage which affects his mental state now, and which affected his mental state at the time of the offenses, a new trial should be granted. In his petition the appellant relies heavily on an affidavit by Dr. Jonathan Pincus, a physician specializing in neurology. After reviewing the results of the tests and evaluations of the appellant, Dr. Pincus concluded that the appellant suffers from organic brain defects that probably impaired his capacity to distinguish right from wrong and conform his conduct to the law. Dr. Pincus did not personally examine the appellant, nor did he review the testimony of the experts. His diagnosis is based only upon his review of all the previous sanity evaluations and the neurological test results.

To warrant a new trial based on newly discovered evidence an appellant must show that:

(A) The evidence was discovered after the trial;

(B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and

(C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

R.C.M. 1210(f)(2).

 Prior to his court-martial, two psychiatrists and a psychologist individually examined the appellant. Based on their evaluations, including a statement that the appellant exhibited symptoms associated with organic involvement, the defense did not raise a sanity issue on the merits of the trial. Since his court-martial, the appellant has been the subject of two sanity boards and extensive neurological testing, which the appellant contends contains the new evidence warranting a new trial. The evidence of organic brain damage is not newly discovered: according to the appellant's own brief there were "clear indicators of appellant's organic brain damage ... present at the time of trial...."

Even if we were to agree the evidence qualified as newly discovered evidence in deciding this particular issue, this Court need not and will not decide whether the appellant is or was mentally responsible. *United States v. Triplett*, 45 C.M.R. 271 (C.M.A.1972). What we must decide is whether there is evidence that warrants a rehearing to determine whether the appellant is mentally responsible. *United States v. Lilly*, 25 M.J. 403 (C.M.A.1988). The test is whether "the appellate court [is] convinced beyond a reasonable doubt that a different result would not obtain if the trier of fact had this new evidence before it." *United States v. Dock*, 28 M.J. 117, 120 (C.M.A.1989). *See United States v.*

*Cosner*, 35 M.J. 278 (C.M.A.1992). The mere existence of conflicting psychiatric opinions does not necessarily require a rehearing. *Dock*, at 119. *See also Triplett*, 45 C.M.R. at 277.

The most recent sanity board (June 1990) concluded that the appellant's mental infirmities were not so severe as to render him not mentally responsible. Additionally, although the members found undifferentiated brain damage, the board reported that it does not appear of sufficient magnitude to negate criminal responsibility. In the words of the board, in order to warrant a finding of a severe mental defect, there would have to be a severe organic disorder, which there is not. The neuropsychological evaluation, ordered by this Court on 31 December 1991 and administered by Dr. Fred Brown, a clinical neuropsychologist, does refer to evidence of organic brain damage. Nevertheless, although Dr. Brown states he did find evidence of symptoms of an undetermined organic brain syndrome, he did not find evidence of a psychological or personality disorder resulting from the organic brain syndrome such that it would meet criteria of an organic mood (thought anxiety).

More specifically, in an affidavit dated 23 March 1992 obtained by the appellee, Dr. Brown stated that despite appellant's mild organic brain damage the appellant is now, and Dr. Brown believes was at the time of the offenses, able fully to appreciate the nature and quality of his acts and the wrongfulness of his acts.

It is clear that the newly discovered evidence cited by appellate defense counsel is not of a caliber to produce a more favorable verdict. *Dock*, 28 M.J. 117 (C.M.A. 1991); *see also Lilly*, 25 M.J. 403 (C.M.A. 1988).

The appellant also asserts that, should this Court deny his petition for a new trial, at the very least a sentence rehearing should be authorized. We disagree. Even if this Court found that the evidence of organic damage should have been introduced as a mitigating factor, a sentence rehearing is not required. This Court need not use a more generous approach to deciding a petition for a sentencing rehearing than we used here to resolve the appellant's petition for a new trial. *Cosner*, 35 M.J. at 282. As long as the possible mitigating evidence does not implicate the validity of the aggravating factors found by the panel, we are convinced beyond a reasonable doubt that the panel would still have imposed the death sentence. *See Sawyer v. Whitley*, 945 F.2d 812 (5th Cir.1991), *cert. granted*, —— U.S. ——, 112 S.Ct. 434, 116 L.Ed.2d 453 (1991), *judgment affirmed*, —— U.S. ——, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). Finally, we have "no doubt whether the trial sentencer would have adjudged a more lenient sentence." *Cosner*, 35 M.J. at 282.

## XV. MISINFORMATION CONCERNING THE APPELLANT'S MENTAL HEALTH

The appellant contends that he was convicted and sentenced to death in violation of the Fifth, Sixth, and Eighth Amendments of the United States Constitution because the sentence and convictions are founded, at least in part, upon misinformation concerning his mental health. This contention is without merit.

The appellant's assertion that his conviction and sentence were based on misinformation and inaccuracies is incorrect. It is true that the appellant now possesses information that was not presented at trial, but the information presented at trial has not been proven incorrect. To gain sentence relief the appellant must show that constitutional error infected the sentencing process to such a degree that it is more probable than not that, but for the constitutional error, the sentence of death would not have been imposed. *Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). In *Sawyer v. Whitley*, the appellant unearthed additional evidence of organic brain damage and mental disorders. 945 F.2d 812. The court held this evidence did not implicate the validity of the aggravating circumstances so a rational trier of fact could still have sentenced him to death. *Id.* In the appellant's case, we hold that he has failed to show by clear

and convincing evidence that, but for constitutional error at his sentencing proceedings, no reasonable court members would have imposed the death penalty under the Uniform Code of Military Justice.

## XVI. FUNDS FOR AN INDEPENDENT INVESTIGATOR

The appellant alleges the military judge denied him due process of law by refusing to grant him the funds to hire an independent investigator. It is clear that an accused is entitled to investigative assistance. *See United States v. Garries,* 22 M.J. 288 (C.M.A.1986), *cert. denied,* 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986); *United States v. Mustafa,* 22 M.J. 165 (C.M.A.1986), *cert. denied,* 479 U.S. 953, 107 S.Ct. 444, 93 L.Ed.2d 392 (1986). In the majority of cases, the investigative services available in the military are sufficient. *Garries,* 22 M.J. at 291. Our appellate review of whether or not funds should have been granted involves an assessment of the reasonableness of the military judge's ruling at the time it was made. We must look at the sufficiency of the accused's explanation, determine if he showed the requisite need and justification, and decide whether the assistance provided was adequate. *See United States v. Mann,* 30 M.J. 639 (N.M.C.M.R.1990), *review denied,* 32 M.J. 45 (C.M.A.1990).

The defense team requested assistance early in the proceedings. In response, a Criminal Investigation Command [hereinafter CID] agent was appointed specifically to assist the defense in its investigation. In response to the defense's request, the CID agent's actions included locating and interviewing the appellant's natural father, obtaining blood and saliva samples from two possible suspects, and questioning the Terminal Cab Company drivers. After carefully reviewing the specific requests made by the defense and the information provided in response by the CID agent, we conclude that the assistance provided was adequate and that the military

judge acted within his discretion in denying the request for funding for an independent investigator.

## XVII. RIGHT TO COMPETENT PSYCHIATRIC ASSISTANCE

The appellant asserts that the inadequate evaluation, preparation, and presentation of his case by the psychiatrists at trial violated his constitutional right to competent psychiatric assistance. His claim is principally based on perceived violations of what he claims is the "national standard of care in psychiatry" as set forth by an "eminent" psychiatrist and neurologist he consulted. Cited as examples of the psychiatrists' incompetence [9] is their failure to obtain a medical or social history of the appellant and their failure to rule out organic brain damage before diagnosing personality disorder.

Here the issue is different from the typical case in which the appellant raises the question of whether or not he was provided psychiatric assistance. *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In this case, instead of a claim that the appellant was denied access to psychiatric assistance, the appellant alleges the assistance was incompetent and therefore unconstitutional.

There are several problems with the appellant's allegation. First is his definition of what constitutes a competent psychiatrist. He assumes we will accept as correct and binding a definition of the national standard as set forth by a psychiatrist of his selection. A federal court has defined a competent psychiatrist as one who has been licensed or certified to practice. *Clisby v. Jones,* 907 F.2d 1047 (11th Cir.1989), *rehearing granted, opinion vacated,* 920 F.2d 720 (11th Cir.1990), *on rehearing,* 960 F.2d 925 (11th Cir.1992).

Secondly, even if we were to accept a standard similar to the one proposed by the appellant, we disagree that *Ake* requires the appellant to have a psychia-

---

**9.** The appellant is referring to Dr. Rose and Dr. Armitage, the psychiatrists who examined appel-

lant prior to trial.

trist who performs up to those standards. In *Clisby,* the court held that, although it is reasonable to require the state to provide a properly qualified psychiatrist, it is not acceptable to burden the state with legal responsibility for the errors of a properly qualified psychiatrist. One must be sure to distinguish the constitutional right to a competent attorney from the right in *Ake* to competent psychiatric assistance. There is no constitutional guarantee to a competent psychiatrist. Even if there were such a guarantee, we find no merit to the appellant's contention. The psychiatrists who examined the appellant were licensed and certified. Neither the appellant nor the appellee objected to the psychiatrists' qualifications, nor did they question their competency at trial.

Thirdly, the appellant's alleged factual basis for his charge that the trial psychiatrists were incompetent is meritless. The appellant alleges that the results of the post-trial tests are so significantly different, as to prove that the trial psychiatrists were incompetent. This is untrue. The sanity boards and the most recent tests all conclude the same thing: the appellant was not and is not suffering from a mental disease or defect. In fact, the conclusions of all the different tests and boards do not vary significantly. Thus, the appellant's claim lacks any factual basis.

Despite the appellant's arguments, it is doubtful whether this Court should get involved in reviewing the competency of psychiatrists. As the Supreme Court stated in *Ake,* "Psychiatry is not ... an exact science, and psychiatrists disagree widely and frequently ... on the appropriate diagnosis...." 470 U.S. at 81, 105 S.Ct. at 1095. In two recent federal decisions, allegations of violations of due process because defendants' psychiatrists were incompetent were rejected. *See Harris v. Vasquez,* 949 F.2d 1497 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992) (the courts cannot conduct a psychiatric medical malpractice review to determine whether the appellant's psychiatrist was competent); *Silagy v. Peters,* 905 F.2d 986 (7th Cir.1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991) (the

courts cannot get into a situation of reviewing a psychiatrist's performance, we do not want a situation of expert psychiatrists being appointed for the sole purpose of discrediting a prior psychiatrist's diagnosis). We refuse to enter into a situation where we are determining the competency of a psychiatrist. The allegation is without merit.

## XVIII. SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

▇▇▇ The appellant alleges the outcome of his trial is unreliable because his trial defense counsel was ineffective. He cites four errors which he asserts are individually grounds for a finding of ineffectiveness of counsel. To sustain an ineffectiveness of counsel claim, the court must find that the counsel was incompetent *and* that the appellant suffered prejudice because of the incompetency. *United States v. Scott,* 24 M.J. 186 (C.M.A.1987). To determine the validity of an ineffective assistance of counsel claim, we must answer three questions: (1) Are the allegations made by the appellant true; and if they are, is there a reasonable explanation for the defense counsel's actions; (2) If they are true, did the level of advocacy fall below the level of performance ordinarily expected of counsel; *United States v. DiCupe,* 21 M.J. 440, 442 (C.M.A.1986), *cert. denied,* 479 U.S. 826, 107 S.Ct. 101, 93 L.Ed.2d 52 (1986); and (3) "[W]hether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Scott,* 24 M.J. at 189, *quoting Strickland v. Washington,* 466 U.S. 668, 695, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984); *United States v. Polk,* 32 M.J. 150 (C.M.A.1991), citing *United States v. McGillis,* 27 M.J. 462 (C.M.A. 1988) (memorandum opinion and order).

The appellant first asserts that his trial defense counsel was ineffective because he failed to adequately investigate the mitigating circumstances of the appellant's traumatic family background. He cites the evidence recently obtained by his appellate defense counsel in the form of affidavits

from the appellant's mother, father, sister, uncle, and aunt as proof of the ineffectiveness. In particular, the appellant cites evidence of head injuries suffered by him as a child from falls and beatings which may have caused organic brain damage. Further, he cites his turbulent family history, to include beatings by his alcoholic stepfather and severe emotional distress from growing up in such a stressful environment.

■ We do not dispute that a defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Scott*, 24 M.J. at 188, *quoting Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984); *United States v. Polk*, 32 M.J. 150 (C.M.A.1991). A counsel's performance may be found to be ineffective if he performs little or no investigation. *Chambers v. Armontrout*, 907 F.2d 825, 829 (8th Cir.1990) (en banc), *cert. denied*, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990).

■ The defense counsel in this case conducted a reasonable background investigation. The appellant's mother, sister, and uncle all testified at the sentencing portion of the appellant's trial. They testified to the abuse the appellant suffered as a child at the hands of his stepfather and generally about the conditions under which he grew up. At the defense counsel's request, the appellant's natural father was interviewed by CID. In addition, Dr. Armitage, a forensic psychiatrist who conducted a sanity board on the appellant, testified about the appellant's social background of growing up in the projects, his alcohol dependence, and his abusive stepfather. Considering all this evidence, we hold the defense counsel's performance did not fall below that ordinarily expected of an attorney, as he conducted an adequate investigation.

In a similar claim of ineffectiveness the appellant asserts that his trial defense counsel presented an inadequate case during sentencing. The appellant claims that the ineffectiveness of his defense counsel prevented his strong mitigating evidence from being presented. This allegation is not true. As stated above, substantial mental health evidence was introduced during sentencing. Three mental health experts (two forensic psychiatrists and a psychologist) testified on behalf of the appellant during sentencing. In addition, evidence of the appellant's upbringing and family life was brought out by testimony from his mother, sister, and uncle.

■ The appellant also claims that his trial defense counsel's failure to challenge the professional competence of the pretrial evaluations of the appellant by the two forensic psychiatrists was ineffective assistance of counsel, as was his failure to ensure the experts did a complete and competent mental health evaluation of appellant. According to the appellant, his defense counsel had the ultimate responsibility to ensure the experts' evaluations were conducted in a professionally adequate manner. He cites as ineffective assistance the defense counsel's failure to undertake any investigation of the professional competence of the pretrial psychiatric evaluations. He faults counsel for relying upon the appointed psychiatrists to conduct professionally competent evaluations, stating this reliance was unseasoned and unreasonable.

As stated in a previous assignment of error (*see* Part XVII), the appellant's belief that the psychiatrists were incompetent rests on the fact that they did not diagnose him as suffering from organic brain damage and therefore not mentally responsible. The only evidence submitted by the appellant to prove the experts who examined him were incompetent consists of the opinions from two other experts, one a neurologist, the other a psychiatrist-neurologist.

The experts that examined the appellant prior to trial, the two forensic psychiatrists and a psychologist, were all properly credentialed in their respective fields. The defense counsel met with the experts and discussed their findings and conclusions. Short of hiring another expert to evaluate the first experts there was no way the defense counsel could be expected to know

whether or not they were competent. In a similar case, the appellant alleged ineffective assistance of counsel in connection with his attorney's choice of psychiatric experts. *Harris v. Vasquez*, 949 F.2d 1497. The court held that it is certainly within the wide range of professionally competent assistance to rely on properly selected experts. 949 F.2d at 1525. In the appellant's case, there were no facts alleged that indicated counsel should not have selected either of the two experts or that there was any reason to believe either one was incompetent or their credentials deficient.

 Finally, the appellant claims his trial defense counsel was ineffective because he failed to raise the defenses of lack of mental responsibility and lack of a specific intent to kill. The appellant alleges that because of the lack of investigation the defense counsel was unaware that these defenses existed. We find the defense counsel's decision not to raise these defenses was a tactical one and cannot be categorized as incompetent performance. The appellant had undergone extensive mental health examinations and the experts all agreed that he was mentally competent and did not lack mental responsibility. Moreover, it is clear from the psychiatrist reports that the appellant was mentally capable of forming a specific intent to kill.

## XIX. PRETRIAL PUBLICITY

The appellant contends that he was denied a fair trial by an impartial court-martial panel in violation of the Fifth, Sixth, and Eighth Amendments because of prejudicial pretrial publicity. We disagree.

 The Supreme Court held in *Irwin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), that the trial court's findings of juror impartiality may be overturned only for "manifest error." There are two standards by which to judge prejudicial pretrial publicity. The first, presumed prejudice, is rarely applicable and is reserved for extreme situations. *Nebraska*

*Press Ass'n v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976). In order to show presumed prejudice, the appellant must show that the pretrial publicity is prejudicial and inflammatory and it saturated the community. To show saturation, there must be evidence of the amount of pretrial publicity and the number of individuals exposed to it. *Mayola v. State of Alabama*, 623 F.2d 992 (5th Cir. 1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981). The appellant's case does not meet the level needed for presumed prejudice. The second standard is actual prejudice. *Irwin v. Dowd*, 366 U.S. at 721–28, 81 S.Ct. at 1641–45. The extensive individual voir dire in this case proves there was no actual prejudice. Each member was questioned as to what he had heard or read about the case and whether he had formed a prior opinion of the appellant's guilt or innocence. All the members stated they had not yet formed an opinion. *See United States v. Smith*, 1 M.J. 1204 (N.C.M.R.1977), *pet. denied*, 3 M.J. 164 (C.M.A.1977) (even if members have heard or read about the case it is not a sufficient basis for change of venue as long as they deny being influenced); *but see Mayola v. State of Alabama*, 623 F.2d at 1001 (one cannot determine jurors are impartial based upon the individual member's assertion that he or she is impartial). The judge can determine whether the members are impartial based on the individualized voir dire. *Yount v. Patton*, 710 F.2d 956, 979 (3rd Cir.1983), *cert. granted*, 464 U.S. 913, 104 S.Ct. 272, 78 L.Ed.2d 254 (1983), *reversed by*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) (skillful voir dire should be adequate to identify juror bias even when community is saturated with publicity). In addition, an impartial juror does not have to be one who is wholly ignorant of the case. *Mayola* at 998.

## XX. DEFENSE REQUEST FOR MISTRIAL

The appellant contends that the military judge improperly denied a defense request

for a mistrial based on the trial counsel's comments on the appellant's silence and courtroom demeanor. The contention is without merit.

■ The appellant cites only one specific instance where the trial counsel commented on the appellant's demeanor and lack of remorse.[10] The cited remark was made during the sentencing argument. This Court recently held that comments on lack of evidence of remorse are not improper. *United States v. Carroll*, 34 M.J. 843 (A.C.M.R.1992); *see also United States v. Herrington*, 2 M.J. 807 (A.C.M.R.1976) (comment concerning lack of remorse by the appellant improper but error waived by lack of objection); *United States v. Gibson*, 30 M.J. 1138 (A.F.C.M.R.1990), *review denied*, 32 M.J. 247 (C.M.A.1990) (argument that the defendant did not express remorse not improper); *but see United States v. Turner*, 30 M.J. 1183 (A.F.C.M.R. 1990), *on rehearing*, 34 M.J. 1123 (A.F.C.M.R.1992) (argument that defendant can't admit what he did found to be plain error); *United States v. Jones*, 30 M.J. 898 (A.F.C.M.R.1990), *review denied*, 32 M.J. 371 (C.M.A.1990) (pointing out defendant's lack of acknowledgment of guilt in sentencing argument held to be plain error).

This Court has also recently held that a comment on the appellant's "cold as ice" demeanor was cured by the judge's instruction on the appellant's right to remain silent. *United States v. Kirks*, 34 M.J. 646

(A.C.M.R.1992). Such a curative instruction was given in this case.[11]

## XXI. REASONABLE DOUBT INSTRUCTION

The appellant contends that the instructions to the court members which purported to define reasonable doubt violated the appellant's right to due process of law by lessening the government's burden of proof. We disagree.

■ The instructions given by the military judge are virtually identical to the instructions found in the benchbook,[12] except for the first line in which he says "a doubt founded in reason." The appellant relies almost exclusively upon the *Cage* decision which reversed a conviction because the jury instructions equated reasonable doubt with "grave uncertainty" and "actual substantial doubt." *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990); *see Gaskins v. McKellar*, —— U.S. ——, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991).

■ There are two problems with appellant's reliance on *Cage*. First, in the appellant's case reasonable doubt is not compared to grave uncertainty or actual substantial doubt. Second, the precedential value of *Cage* is questionable in light of the Supreme Court's recent repudiation of the analytical standard underlying its decision in *Cage*. *See Estelle v. McGuire*, —— U.S. ——, 112 S.Ct. 475, 116

---

10. Trial Counsel said "has he ever indicated to you by his actions any remorse for what he's done?" (R. 2537).

11. Almost immediately after the trial counsel's argument, the military judge instructed the court members in pertinent part:

> With regard to counsel's indication, or phrase, "has the accused indicated by his actions any remorse?" That is susceptible of an interpretation of a comment upon his—the accused having remained silent and not having testified in the case, as I'm sure you are aware. The right to remain silent is a constitutional guarantee of all of us, and no inference—adverse inference may be drawn from the fact that the accused elected not to testify in this case. And I'm sure that you will not draw any such adverse inference, nor read into it—

the counsel's—trial counsel's closing argument, that that was a comment upon his right to remain silent.

12. Dep't of Army Pam. 27–9, Military Judges' Benchbook, para. 2–29.1 (1 May 1982) (C3, 15 Feb. 1989). The first sentence of the reasonable doubt instruction reads: "By 'reasonable doubt' is intended not a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or a lack of it in the case." The military judge instructed: "A 'reasonable doubt' is what the words imply, a doubt founded in reason. It is not a fanciful or ingenious doubt, or conjecture, but an honest, conscientious doubt suggested by the material evidence or a lack of it in the case."

L.Ed.2d 385 (1991). The test now is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. *Id.* In addition, contrary to the appellant's assertion, the language "to a moral certainty" is proper. *Hatheway v. Secretary of the Army,* 641 F.2d 1376 (9th Cir.1981), *cert. denied,* 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981).

## XXII. PROPORTIONALITY REVIEW

■ The Court of Military Appeals recognized that a proportionality review is not required by the Eighth Amendment, but held that such a review is encompassed under this Court's obligation under Article 66(c), UCMJ. *United States v. Curtis,* 32 M.J. 252, 270 (C.M.A.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991); *United States v. Curtis,* 33 M.J. 101 (C.M.A.1991). In accordance with *Curtis,* before a death sentence can be approved we must determine:

(c) whether the death sentence adjudged is proportionate to other death sentences that have been imposed [using generally similar cases reviewed by the Supreme Court of the United States in which state courts have imposed the death penalty for like crimes on that basis. 33 M.J. at 109].

*Curtis,* 32 M.J. at 271.

■ We have examined a number of cases and have concluded that the sentence is generally proportional to those imposed by other jurisdictions in similar situations.[13] *See Loving,* 34 M.J. at 969–70.

## XXIII. SENTENCE APPROPRIATENESS

■ To determine whether the sentence to death is appropriate in this case we must determine three things:

(a) whether one or more valid aggravating factors have been unanimously found by the court-martial and this finding is factually and legally correct; (b) if any corrective action results in setting aside any such finding but leaves intact at least one "aggravating factor" whether this error affected imposition of the sentence; … and (d) whether under all of the facts and circumstances of the case the death sentence is appropriate, Art. 66(c).

*Curtis,* 32 M.J. at 271.

■ Accordingly, we have independently weighed the evidence and agree with each of the aggravating factors found by the court-martial. We find that each aggravating factor in this case, standing alone, is sufficient to authorize the death penalty. We also find that any extenuating and mitigating circumstances[14] are substantially outweighed by the aggravating circumstances. We conclude that the sentence is appropriate for the crimes of which the accused stands convicted.

Pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), we have also considered the personal assertions of the appellant and find them to be without merit.

For the foregoing reasons, the Petition for New Trial is denied. The findings of guilty and the sentence are affirmed.

Judge GRAVELLE and Judge JOHNSTON concur.

---

13. A computer search was used to examine cases reviewed by the Supreme Court since the reinstatement of the death penalty following *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Among the cases examined were *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990); *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); *Blystone v. Pennsylvania,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990); and *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

14. The following extenuating and mitigating circumstances were to be considered by the court members: (1) The appellant's age, which was 22 years; (2) His good military character; (3) The fact that he suffered from a personality disorder; (4) The length of his pretrial confinement; (5) The appellant's GT score of 106; (6) The fact that he is entitled to wear the Good Conduct Medal and the Army Achievement Medal; (7) The fact that he has no prior court-martial convictions or Article 15 punishments; and (8) Photographs, indications of the schools he attended, and some of the drawings he made. (R. 2563–65).

APPENDIX

UNITED STATES ARMY COURT
OF MILITARY REVIEW

Before NAUGHTON, HOWELL,
and JOHNSTON Appellate
Military Judges

UNITED STATES, Appellee

v.

Specialist Four RONALD GRAY, 261–69–
7258, United States Army, Appellant

ACMR 8800807

ORDER

WHEREAS, this case is currently scheduled for oral argument before the United States Army Court of Military Review, Panel 4, on 13 November 1991 at 0900 hours; and

WHEREAS, the pleadings in this case have been before this Court for the past fifteen months (July 1990) and oral argument has been scheduled at various times since 5 December 1990; and

WHEREAS, on 27 December 1990, the appellant filed a petition (motion) before this Court requesting that the Government provide the appellant with $15,000.00 to be used by appellate defense counsel to retain a mental health expert, an attorney qualified under the standards of the American Bar Association to represent defendants in capital cases, and a qualified investigator to assist with appellant's appeals; and

WHEREAS, this Court denied that petition on 12 March 1991 (*United States v. Gray*, 32 M.J. 730 (A.C.M.R.1991)); and

WHEREAS, this Court previously determined that appellant's counsel was "qualified" within the meaning of Articles 27 and 70, Uniform Code of Military Justice, 10 U.S.C. §§ 827, 870, as well having satisfied the Alternate Procedures of the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (*United States v. Gray*, 32 M.J. at 734); and

WHEREAS, this Court has also previously held in *United States v. Gray*, 32 M.J. at 735, that "[w]e will intervene, when requested, to ensure counsel's case load and management pressures do not compromise the quality of capital case representation"; and

WHEREAS, on 7 August 1991, appellant filed a second petition (motion) before this Court requesting the Government be ordered to provide $10,000.00 to be used by appellate defense counsel to retain a mental health expert and a qualified investigator; and

WHEREAS, that motion was denied on 23 August 1991; and

WHEREAS, on 21 September 1991, the appellant petitioned the United States Court of Military Appeals for extraordinary relief in the nature of a writ of mandamus to order the Government to provide $10,000.00 to be used by appellate defense counsel to retain a mental health expert and a qualified investigator to evaluate appellant and to assist in the appeal of his convictions and death sentence, and an emergency stay of the proceedings in the Army Court of Military Review; and

WHEREAS, on 18 October 1991, the United States Court of Military Appeals denied the writ appeal petition and application for emergency stay; and

WHEREAS, on 7 November 1991, appellate defense counsel has now requested to withdraw as attorney for the appellant; and

WHEREAS, the appellate defense counsel has stated he is unable to provide the appellant with quality, competent representation because he needs funding to obtain experts to assist him, and his current work load does not allow him adequate time to prepare; and

WHEREAS, the Chief of the Defense Appellate Division has responded to this Court that the sole appellate defense counsel for the appellant in this case has long expressed his concerns about his competence to represent a capital client on appeal, the fact that such appellate defense counsel must bear a "normal" case load in addition to this case, and that there is no additional manpower to afford the Chief of the Defense Appellate Division flexibility

to substantially lighten appellate defense counsel's work load despite the persistent efforts to have more attorneys assigned to the Defense Appellate Division; and

WHEREAS, the Chief of the Defense Appellate Division has further responded that there is no counsel within the Defense Appellate Division more competent or qualified to represent the appellant than his current appellate defense counsel; and

WHEREAS, this Court finds that appellate defense counsel is qualified and competent to represent the appellant; and

NOW, THEREFORE, in response to appellate defense counsel's motion to withdraw as attorney for appellant, it is by this Court, this date

ORDERED:

1. That the "Motion to Withdraw as Attorney for Appellant" is denied.

2. That the matter of the Government providing funds for appellate defense counsel to retain a mental health expert and a qualified investigator, having been raised twice before this Court and once before the United States Court of Military Appeals and resolved on all occasions against the appellant, is no longer an issue before this Court.

3. That because of the circumstances of this particular case, except for those cases in which appellate defense counsel is currently scheduled to orally argue before this Court or the United States Court of Military Appeals, all of the remaining case load which appellate defense counsel currently has shall be delayed or reassigned to other counsel within the Defense Appellate Division by the Chief of the Defense Appellate Division until completion of oral argument in this case (unless appellate defense counsel determines he can adequately represent the appellant with a reduced case load as is best determined by him). Additionally, appellate defense counsel will not be assigned any new cases until completion of oral argument in this case.

4. That appellate defense counsel's motion to withdraw, this Court's order of 8 November 1991, the response to that order by the Chief of the Defense Appellate Division, and this order be provided to The Judge Advocate General.

5. That the appellant's case is rescheduled for oral argument before the United States Army Court of Military Review, Panel 4, on 11 March 1992 at 0900 hours, and any additional pleadings filed by appellate defense counsel are due on or before 12 February 1992.

Date: 12 November 1991